Grace Perrine, Plaintiff-Appellee, v. Charles T. Bisch
and Son, and Mae Esper, Defendants-Appellants.
Mae Esper and L. W. Esper, Counterclaimants-
Appellants, v. Charles T. Bisch and Son, Counter-
defendant-Appellee.

Gen. No. 9,804.

Opinion filed March 11, 1952. Rehearing denied May 6, 1952. Released for publication May 6, 1952.

MARK O. ROBERTS, of Springfield, for counterclaimants-appellants, A. M. FITZGERALD, of Springfield, for counterdefendant-appellant.

G. W. HORSLEY, of Springfield, for appellee.

MR. JUSTICE REYNOLDS delivered the opinion of the court.

This is an appeal from judgments in the circuit court of Sangamon county and comes to this court as a consolidated appeal. Grace Perrine, plaintiff-appellee recovered judgment in the amount of $20,000 against the defendants-appellees, Charles T. Bisch & Son, a corporation and Mae Esper. Charles T. Bisch & Son, a corporation and Mae Esper appeal from that judgment. Mae Esper and L. W. Esper counterclaimed against Bisch & Son and the judgment of the circuit court was in favor of the counterdefendant Bisch & Son and against Mae Esper and L. W. Esper, counter-

claimants. Mae Esper and L. W. Esper, appeal from that judgment. The appeals have been consolidated and will be decided by this court in one opinion.

This case was originally appealed directly to the Supreme Court, but the Supreme Court found that the case was wrongfully appealed to that court and ordered that the same be transferred to this court.

On March 22, 1948, Grace Perrine was riding in the ambulance of Charles T. Bisch & Son, with her husband, who had suddenly become ill and the ambulance called. Driving the ambulance was one John L. McDonald, an employee of Bisch & Son. Riding in the front seat beside McDonald, was another employee. Bisch & Son operate ambulance service in the City of Springfield, Illinois, for hire. The ambulance, leaving the Perrine home, proceeded to Capitol avenue, which runs east and west and then proceeded west on Capitol avenue to the point of the collision. Mae Esper, driving alone in the car of her husband, L. W. Esper, was driving north on Sixth street, which runs north and south. The collision occurred at the intersection of Capitol avenue and Sixth street, which is one of the busy intersections of the City of Springfield. The intersection has stop and go signals with red, amber and green lights. While there is some dispute, there seems little question that the ambulance had its flasher lights on and was warning traffic with its siren, both on Capitol avenue and on the streets between the Perrine home and Capitol avenue, it had used. Evidence of the speed of the ambulance varies from the 15 to 20 miles per hour estimate of the driver McDonald, to the 50 to 60 miles per hour estimate of Mrs. Esper. Mrs. Esper drove into the intersection and was hit broadside by the ambulance. Estimates of her speed vary from 15 to 35 miles per hour. Mrs. Esper testified that she did not see the ambulance until she was a

third or a fourth of the way across the south half of the intersection; that she looked to the right as she entered the intersection and did not see anything; that her windows were up and that she did not hear the siren; that the ambulance was so close when she first saw it that she did not have time to do anything to avoid the collision. McDonald, the driver of the ambulance testified that he did not see the Esper car until it was in front of him; that he stood the ambulance on its nose and then the collision occurred. There seems to have been two sudden stops, one when McDonald applied the brakes, and then when the ambulance collided with the Esper car. Mrs. Perrine, riding in the back of the ambulance with her husband, was thrown about in the inside of the ambulance and received the injuries for which she brings suit.

As to the traffic lights, there is some dispute but from all the evidence, it is fairly well established that the red light was against McDonald, the driver of the ambulance, when he was 45 feet away from the intersection. According to the officers who investigated the accident immediately afterwards, McDonald said that he thought the light was red and that he thought he ran the red light; that he intended to go into the intersection whether the light was red or not.

The evidence is also conflicting as to the color of the traffic lights when Mrs. Esper drove into the intersection. Mrs. Esper said the lights turned green for north and south traffic when she was 100 feet south of the intersection. Robert Hansen testified the light changed to yellow when Mrs. Esper reached the crosswalk. Dr. Campbell testified the light was green for north and south traffic when he heard the ambulance coming. The ambulance then was about a block away. Betty Roberts said that as the ambulance was entering the intersection the lights changed to red for east and west traffic and that as the lights were chang-

ing, she saw the Esper car headed into the intersection. C. A. Livingstone said the lights were green for north and south traffic when Mrs. Esper entered the intersection. There is some testimony that the Esper car drove into the intersection at an angle or "catty-cornered" as some witnesses put it. Betty Roberts said the Esper car angled to the west in the intersection.

All of these questions were questions of fact and were determined by the jury in its verdict.

██ There can be no doubt that the Bisch ambulance was an emergency vehicle. The fact that it was privately owned is immaterial. The Motor Vehicle Act defines an "Authorized Emergency Vehicle" as follows: "Police Vehicles, Vehicles of the Fire Department, and Ambulances . . ." Section 99, subd. (d), chapter 95½, Illinois Revised Statutes, 1947 [Jones Ill. Stats. Ann. 85.131, subd. (d)].

██ The right of the Legislature to give certain preference to an emergency vehicle is questioned in the appeal. The right of the Legislature to define and set up rules for an emergency vehicle seems obvious under the police power of the State. "In the exercise of the police power of the State, the Legislature may enact those measures which have a tendency to affect the comfort, health, safety, morals or welfare of society." (*Fenske Bros. Inc. v. Upholsterers International Union*, 358 Ill. 239.) In that case the court said: "It is well settled that the legislature may, in the exercise of the police power of the State, enact those measures which have a tendency to promote the public comfort, health, safety, morals or welfare of society." (*Massie v. Cessna*, 239 Ill. 352; *Condon v. Village of Forest Park*, 278 id. 218.) The police power is considered capable of development and modification within certain limits, so that the powers of governmental control may be adequate and meet changing social and eco-

nomic conditions. The power is not circumscribed by precedents arising out of past conditions but is elastic and capable of expansion in order to keep pace with human progress. It is not a fixed quantity, but it is the expression of social, economic and political conditions. (*People v. Rosehill Cemetery,* 334 Ill. 555; *State Public Utilities Commission v. City of Quincy,* 290 id. 360.) In the exercise of this power the legislature may enact laws regulating, restraining or prohibiting anything harmful to the welfare of the people, even though such regulation, restraint or prohibition interferes with the liberty or property of an individual. Neither the Fourteenth Amendment to the Federal Constitution, nor any provision of the Constitution of this State was designed to interfere with the police power to enact and enforce laws for the protection of the health, peace, morals or general welfare of the people. *Powell v. Pennsylvania,* 127 U. S. 678, 32 L. Ed. 253, 8 Sup. Ct. 992; *People v. Anderson,* 355 Ill. 289; *Town of Cheney's Grove v. Van Scoyoc,* 357 id. 52.

And in the case of *Christy v. Elliott,* 216 Ill. 31, the court there said at page 39: "We have said: 'The State inherently possesses, and the General Assembly may lawfully exercise, such power of restraint upon private rights as may be found to be necessary and appropriate to promote the health, comfort, safety and welfare of society. This power is known as the police power of the state. In the exercise of this power the General Assembly may, by valid enactments, — i. e., "due process of law,"—prohibit all things hurtful to the comfort, safety and welfare of society, even though the prohibition invade the right of liberty or property of an individual.' (*Bailey v. People,* 190 Ill. 28; *Booth v. People,* 186 id. 43; *Ruhstrat v. People,* 185 id. 133.)."

The very nature of an ambulance when it is responding to an emergency, lifts it out of the class

of an ordinary vehicle. It then becomes an emergency vehicle and except as is necessary to observe the rules of safety, both for itself and others using the highway, it is entitled to precedence over other vehicles, all other circumstances being equal. In the instant case, the Bisch ambulance was transporting a stricken man to a hospital as quickly as possible. It thus became an emergency vehicle under the meaning of the Statute. We cannot agree with the contention of defendant Esper that a private ambulance stands on a different footing or in a different classification than that of a municipal ambulance. Neither the private or municipal ambulance has or is entitled to any precedence over vehicles when not on an emergency call, but when either is on an emergency call, they become emergency vehicles and are entitled to certain precedence over other vehicles provided they observe the rules of safety. This is not only a humane consideration but is common sense as well, since yielding the right of way to an emergency vehicle may save lives or property.

 This does not mean that an ambulance or any other emergency vehicle has the absolute right of way. They are still subject to the provisions of the law safeguarding the rights of the public generally. In giving a certain preferment to emergency vehicles, the Legislature also set up certain safeguards for the public by making the following laws, all in the Motor Vehicle Act, chapter 95½, Illinois Revised Statutes 1947. The Statute provides in part as follows: (b) "The driver of any authorized emergency vehicle when responding to an emergency call upon approaching a red or stop signal or any stop sign shall slow down as necessary for safety but may proceed cautiously past such red or stop sign or signal. At other times drivers of authorized emergency vehicles shall stop in obedience to a stop sign or signal." Section 120. (c) "No driver of

any authorized emergency vehicle shall assume any special privilege under this Act except when such vehicle is operated in response to an emergency call or in the immediate pursuit of an actual or suspected violator of the law." Section 120.

"The prima facie speed limitations set forth in this article shall not apply to authorized emergency vehicles when responding to emergency calls and the drivers thereof sound audible signal by bell, siren, or exhaust whistle. This provision shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons using the street, nor shall it protect the driver of any such vehicle from the consequence of a reckless disregard of the safety of others." Section 150.

"Upon the immediate approach of an authorized emergency vehicle, when the driver is giving audible signal by siren, exhaust whistle, or bell, the driver of every other vehicle shall yield the right-of-way and shall immediately drive to a position parallel to, and as close as possible to, the right-hand edge or curb of the highway clear of any intersection and shall stop and remain in such position until the authorized emergency vehicle has passed, except when otherwise directed by a police officer."

"This section shall not operate to relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons using the highway." Section 169.

From an examination of the above quoted sections of the Motor Vehicle Act, the intentions of the legislature are clearly ascertained. The legislature intended to give the authorized emergency vehicles on an emergency call, certain precedence over other vehicles in order to facilitate the carrying out of the emergency mission. At the same time, it provided that no emergency vehicle could drive at a speed greater

than reasonable and proper, having regard to the traffic and use of the highway, and without complying with all other rules of safety.

One of the matters assigned as error is the contention by the defendant Bisch that Mrs. Perrine was a guest and not a passenger. The plaintiff contends that she was a passenger for hire, or at least was a passenger under circumstances which inured to the benefit of the ambulance company. The evidence is not clear. McDonald, the driver of the ambulance, testified that Mrs. Perrine asked to go along; that she wanted to ride with her husband and that he thought he told her to hold the camphor bottle to.her husband's nose. Mrs. Perrine testified that the ambulance driver told her to get her coat and to hold the camphor bottle; that she sat in the ambulance where directed by McDonald. This part of the case only relates to the defendant Bisch.

██ ██ "The phrase, 'passenger in a vehicle' is used to denote the fact that the plaintiff is one who is being carried by another for hire. Conversely, the word 'guest' is employed to designate one whom the owner or possessor of a motor car or other vehicle invites or permits to ride with him gratuitously, that is, without any financial return except such slight benefits as it is customary to extend as part of the ordinary courtesies of the road. In the recent case of *Duncan v. Hutchinson*, 139 Ohio St. 185, the Ohio Supreme Court said 'Keeping in mind the purpose of the statute, it would seem that any expense money paid by a person for a ride in an automobile which is not substantially commensurate with the cost of such transportation will not take him out of the guest status fixed by the statute, unless payment for transportation as such was actually agreed upon. The justice of this rule is based on the fact that it would be unfair to hold the motorist to liability for injuries to his guest

due to the hazards of transportation, unless the motorist is, in turn, compensated for such transportation in a manner substantially commensurate with the cost and the hazards of the undertaking. On the other hand, where the relationship between the automobile host and a party riding with him has a business aspect and the transportation is supplied for their mutual benefit, any payment or service rendered to the automobile host by such person for the ride will constitute "payment therefor" and will remove the automobile host from the protection of the statute.' " *Miller v. Miller*, 395 Ill. 273 at pages 282 and 283. In the case of *Connett v. Winget*, 374 Ill. 531, the court there said: "In determining whether a person is a guest within the meaning of the 'Guest statutes' in the several States, consideration is given to the person or persons advantaged by the carriage; if it confers only a benefit incident to hospitality, companionship or the like, the passenger is a guest, but if the carriage tends to promote mutual interests of both the person carried and the driver, or if the carriage is primarily for the attainment of some objective or purpose of the operator, the passenger is not a guest within the meaning of such enactments."

 ██ Here there is no question that Bisch and Son charged for their services. It seems equally clear that Mrs. Perrine in assisting in caring for her husband in the ride to the hospital, tended to promote the mutual interests of both herself and the ambulance company, who received a compensation for hauling people to the hospital. Each case must, of necessity, rest upon its own facts. This question of fact was here decided by the jury in reaching their decision and this court is not inclined to disturb the finding of the jury.

 The appellants complain of certain instructions, which were either given or refused. An exam-

ination of the record disclosed that the trial court gave eighteen instructions for the plaintiff, twenty-five for the defendant Esper and sixteen for the defendant Bisch. Taken as a whole, we think the trial court gave complete and fair and reasonable instructions.

██ ██ The question of the amount of the judgment is raised by both of the appellants. The evidence shows that the actual out-of-pocket expense of the plaintiff was $1,510. The evidence shows that there is an overriding of the pelvic bone; that there is some arthritic condition; that the plaintiff was in a hospital for three months, and that for nine weeks she was suspended in a sling with weights; that there is some twisting of the vertebrae. This evidence is not refuted or contradicted. There seems to be no question that the plaintiff has received serious and permanent injuries which will probably remain with her as long as she lives. The fixing of the amount of her damages is peculiarly a province of the jury and it has been the policy of this court to not disturb the findings of the jury, where it is not clearly the result of passion, prejudice or misunderstanding. No such fact or circumstances are shown to exist here and this court will not substitute its judgment for that of the jury.

██ ██ The only other questions were questions which again, are within the province of the jury to pass upon: 1. Was Bisch & Son, in the operation of its ambulance, guilty of negligence proximately causing the plaintiff's injuries? The jury by its verdict said "yes." 2. Was Mae Esper, in the operation of her automobile, guilty of negligence, proximately causing the plaintiff's injuries? The jury by its verdict said "yes." 3. Was Charles T. Bisch & Son, in the operation of its ambulance, guilty of negligence, proximately causing the counterclaimant Mae Esper's injuries? The jury by its verdict said "No." 4. Was Charles

T. Bisch & Son, in the operation of its ambulance, guilty of negligence proximately causing the damage to counterclaimant L. W. Esper's automobile? The jury by its verdict said "No."

The judgment of the circuit court of Sangamon county is affirmed.

*Affirmed.*