WALTER A. FREEMAN & COBB FUNERAL HOME, INC.
*v.* LEE R. REEVES & VIRGIE REEVES

5-4058                                                410 S. W. 2d 740

Opinion delivered January 30, 1967

*Reid, Burge & Prevallet,* for appellant.

*Gardner & Steinsiek,* for appellee.

JOHN A. FOGLEMAN, Justice. Appellees, Lee R. and Virgie Reeves, husband and wife, recovered judgments of $6,500.00 and $12,000.00 respectively against Walter A. Freeman and Cobb Funeral Home, Inc., on February 1, 1966 for injuries and damages sustained as a result of a collision between a Blytheville city fire truck and an ambulance driven by Freeman for the owner, Cobb Funeral Home, Inc. The collision took place on January 18, 1963 at the intersection of Kentucky and Second Streets in Blytheville. Appellees were occupants of a station wagon which had stopped on Second Street just north of the intersection at a stop sign shortly before the two vehicles collided in the intersection, after which the fire truck struck the front of the station wagon and overturned on top of it. Appellees brought their suit against appellants, Freeman and Cobb Funeral Home, Inc., alleging negligence on the part of Freeman in the operation of the ambulance as the proximate cause of their personal injuries and damages. Appellants filed their answer denying any fault or liability and, with permission of the court, a third party complaint against Billy Bratton, the driver of the fire truck, alleging that the injuries and damages of appellees resulted from

negligence on the part of Bratton, but seeking judgment over against Bratton if judgment should be recovered by appellees against appellants.

After hearing all the evidence and the instructions of the court, the jury, in answer to interrogatories propounded by the trial judge, found that Freeman was guilty of negligence which was a proximate cause of the occurrence but that Bratton was not. Appeal was taken by appellants from the judgment based on that verdict.

Both appellants and the fire truck driver sought to excuse their actions by claiming a status as emergency vehicle drivers and resulting exemption from certain traffic laws and ordinances. The principal ground for reversal urged by appellants is based upon the failure of the trial judge to instruct the jury that the ambulance was an emergency vehicle at the time and place of this occurrence, rather than submitting the question to the jury as a question of fact. This contention was based largely on the testimony of George Ford, a police officer for nine years and assistant chief of police at the time of the incident. He testified that, at that time, the police department had a policy of alternating calls for ambulances between two local funeral homes, calling one the first fifteen days of a month, and the other the last fifteen days. These calls were made whenever the police department received a call for an ambulance or when an officer working a wreck said he needed an ambulance. When asked how he classified ambulances, this witness said: ''As emergency vehicles''. In September, 1965, he (then chief of police) designated all the ambulances as emergency vehicles in writing. The witness had done all administrative work for the department from 1955 up to the time of this collision. His search of the ordinances failed to reveal any designation of ambulances as emergency vehicles. C. W. Short, who served for perhaps ten years, was his predecessor as chief of police. Prior to the written designation, the police treated ambulances owned by these funeral homes as emergency vehicles if they had a patient and were making an emergency run,

but they had no policy and didn't know anything was required.

James Stovall, an employee of Cobb Funeral Home and a witness called by appellants, stated that the City of Blytheville furnished no ambulance service and that the funeral homes answered ambulance calls from the police department without question and without asking who is going to pay the bill. He testified that the ambulance was operated as a public service for which they collected if they could. Both Freeman and Gerald Thomas Moody, the attendant accompanying him, testified that the call being answered came from a nursing home where they picked up a patient who was having a hard time breathing and required the administration of oxygen by the attendant. On the other hand, it was shown that the patient, after being involved in this wreck, was discharged from the hospital on February 26th. The driver and attendant testified that the siren and red light on the ambulance were turned on.

The Arkansas Statute defining authorized emergency vehicles is § 75-402 (d) (Repl. 1957) which reads:

"Authorized Emergency Vehicle. Vehicles of the fire department (Fire Patrol), police vehicles and such ambulances and emergency vehicles of municipal departments or public service corporations as are designated or authorized by the (commissioner) or the (chief of police of an incorporated city)."

Our statutes permit an authorized emergency vehicle to be equipped with a siren, whistle or bell of an approved type and require its use when the vehicle is being operated on an emergency call, otherwise the use of a siren is prohibited. Ark. Stat. Ann. § 75-725 (b) (Repl. 1957). They also require drivers of authorized emergency vehicles, when responding to emergency calls, to slow down as necessary for safety upon approaching red lights or stop signals, but permit their proceeding cautiously past them. § 75-423 (b). Prima facie speed lim-

itations are not applicable to authorized emergency vehicles when responding to emergency calls and sounding an audible signal, but drivers are not relieved of the duty to drive with due regard for the safety of all persons using the streets or of the consequences of a reckless disregard of the safety of others. § 75-606. Upon the immediate approach of such a vehicle giving the proper signal, the driver of every other vehicle shall yield the right-of-way, drive to a position near the right-hand edge of the highway and stop and remain until the emergency vehicle has passed. § 75-625.

Since appellants claimed the status as a defense, the burden was upon them to prove that theirs was entitled to be considered an emergency vehicle. While we think there is substantial evidence on which a jury verdict in favor of appellants might have been sustained, we do not find the evidence to be such that the trial judge committed error in submitting the question to the jury. While we do not hold that the designation or authorization of ambulances by the chief of police must necessarily be in writing, there is certainly a factual question as to whether this designation or authorization had been made by the chief of police. The mere fact that there was a police custom of calling the Cobb ambulance at certain periods and "we" treated such ambulances transporting a patient as emergency vehicles, would not constitute any presumption that these ambulances had been so "designated or authorized", particularly when Ford, administrative officer of the police department at the time the action would have been taken, could find no evidence of such action. It is of some significance that neither Ford nor Stovall testified about any action by the chief of police.

The question of constitutionality of the statute for failure to provide standards upon which the designation or authorization might be made was not raised.

We are also aware of decisions such as *Perrine* v. *Charles T. Bisch & Son,* 346 Ill. App. 321, 105 N. E. 2d

543; *Champagne v. Employers Liability Insurance Corporation*, 112 So. 2d 118 and *Chastant v. Employers Liability Insurance Corporation*, 112 So. 2d 120, which appear to sustain the appellants. The statute applied in the *Perrine* case and the statute then in effect made all ambulances emergency vehicles. Illinois Revised Statutes, § 99 (d), Chapter 95½ (1947). While we do not have the benefit of all the testimony in the *Champagne* and *Chastant* cases, it is clear that the chief of police was the witness by whom recognition of ambulances as emergency vehicles was shown. It is also clear that the court found there was no doubt, from the evidence, that the ambulance involved was a "sanctioned and recognized emergency vehicle". We have found no statute in Louisiana providing for designation or authorization of ambulances as emergency vehicles by a chief of police until 1962, some three years after the decision in those cases, even though there were statutes giving certain exemption to ambulances and emergency vehicles.

Of course, even if an ambulance is exempt from observing certain traffic regulations and has the right-of-way under appropriate circumstances, it does not follow that this is an exemption from the duty to exercise care commensurate with the circumstances for the safety of other travelers or persons. Proper instructions as to these duties of the drivers of these emergency vehicles were given. We think the evidence was sufficient to justify the submission of the question whether there was negligence on the part of appellants to the jury and to sustain the jury's finding that there was such negligence, when viewed in the light most favorable to appellees as we must do.

There was testimony to show the following:

The ambulance struck the fire truck with such force that the whole truck left the ground, turned over on top of the Reeves' car in a sort of angling somersault, with the back end of the fire truck coming to rest on the automobile upside down. The major impact indicates that

the ambulance struck the right rear of the fire truck from the center of its right rear dual wheels toward the rear. The impact was such that the right rear dual wheels were knocked completely loose, three steel tie bolts holding the springs to the axle as big as the fire truck driver's fingers were parted, in two, and another was twisted. The frame of the fire truck was warped. The rear end of the fire truck had passed the center of the intersection and the front end was almost through the intersection when the truck somersaulted. The course taken by the ambulance from the nursing home was north on Ruddle Road, west on Tennessee, south on the street that runs along the west side of Fairview School (probably LaClede) to Kentucky and west on Kentucky to the scene of the collision. The ambulance was coming at a pretty good rate of speed, a lot faster than the speed limit. As the ambulance approached the intersection, it seemed to Reeves to pick up speed (he first saw it a half block away). There was nothing to block the vision of the intersection for traffic coming east and headed west, except a small bush with no leaves on it. The siren at the fire station can be heard for a mile around. The red light on the fire truck was blinking and the siren blowing when it turned on Second Street going north. The driver of the fire truck let up on the gas and looked both ways before he entered the intersection and did not see any vehicle approaching. He could see a good ways up the street. He did not see the ambulance until he had entered the intersection when it was at least thirty to forty yards away. He didn't see the ambulance decrease its speed or take any evasive action. The ambulance was going so fast the fire truck driver could not estimate its speed. It was going awful fast.

This was certainly sufficient to justify the denial of a directed verdict in favor of appellees.

Appellants also contend that the failure of the driver of the fire truck to stop at a stop sign at the intersection under existing conditions (contending that the intersection was blind), made him guilty of negligence as

a matter of law. We think that, at best, this was evidence of negligence, proper for determination by the jury and resolved by it against the appellants.

Another contention of appellants is that the jury verdicts are excessive, without support in the evidence and indicative of passion, prejudice or partiality. Here, again, we must view the evidence in the light most favorable to appellees. When we do so, we find no merit in these contentions.

If the jury viewed the testimony most favorable to Lee Reeves, it may have based its verdict on the following evidence:

That he blacked out; suffered two broken ribs and three cracked ones; severe left chest pain, difficulty in breathing, exhibiting short, rapid, painful respiration; a cut over the left eye; a bruised left knee with limitation of motion, swelling and sprain; a scratch on his lung with scarring which could become an area of chronic bronchitis. His glasses were broken. He was in the hospital four days. He was treated with narcotics for pain, had Furacin applied to his knee and was given Gelusil for indigestion, a cough syrup and antibiotics. He was given an elastic band to hold his ribs immobile. He was unable to go back to work for a couple of weeks at the Blytheville Air Force Base where he was employed as an accounting clerk, losing $450.72. When he was able to return, he could not work a full day. He was given antibiotics again for about eight days. He saw his doctor several times after he was in the hospital and went to a chiropractor because his neck was hurting so badly and got some temporary relief. He took a good many pain pills on account of these injuries. He paid medical and hospital bills totalling $326.27. His automobile loss was $898.28. He lost five days (or $125.20) by reason of having to take his wife to Memphis to a doctor and spent his vacation half a day at a time helping her on her newspaper route. His wife was unable to get

around well, to sleep well, or to do her housework. He had to do some of the housework. She was in the hospital for at least two weeks after the first stay of four days.

As to Virgie Reeves, the jury might have found:

She blacked out and was hysterical when her husband regained consciousness; she was taken to the hospital in Blytheville where she remained under the care of Dr. Files for four days; when she got there she was complaining of very severe headache and pain in her right knee and was moderately upset emotionally. She had some tenderness of the back of her head and base of the skull and pain on motion of the neck. Her exposed skin revealed tiny abrasions and lacerations. There was contusion, swelling, tenderness and general disability of her right knee. She was treated with bed rest, tetanus toxoid booster, a drug to reduce contusion and swelling, narcotics for pain, antinauseants and estrogenic substances. She was discharged for further treatment at her doctor's clinic, still having headaches. She was then unable to sleep (she continued to have trouble sleeping until the time of the trial) and couldn't get around well. She used (and has continued to use) a heating pad and took pain pills. The headaches continued and she was found to have sinusitis for which she was treated with anticongestive products and antibiotics. She then complained of pain in her hip and diathermy treatments were started. When she again complained of headaches and pain in her right hip radiating down the back part of her leg to the knee, Dr. Files made a tentative diagnosis of a ruptured disc. She was returned to the hospital for two weeks where she was treated with drugs to relax her muscles, bed rest, physiotherapy, pain drugs and other measures (put in pelvic traction to decompress the disc). Dr. Files sent her to Dr. DeSaussure, a neurosurgeon in Memphis, who gave her a myelogram at the Baptist Hospital where she remained for several days, after which she had bad headaches for which she was

given medicine. She returned home and continued to see Dr. Files but her condition did not improve. About two months after the injury, she continued to have back and right leg pain when sitting on a hard surface and was given a tranquilizing drug and protein by injection. When the symptoms continued two weeks later, she was started on ultrasonic and diathermy treatments and later had 15 ultrasonic treatments to the low back and right sciatic nerve, along which line she was treated for several months. Dr. Files later diagnosed her condition as spondylolisthesis, or a slipping of one vertebra on another, a condition which is intermittent and may be produced by certain motions, lifting or certain positions, after which the spine may return to normal following bed rest or proper treatment. A person with that condition becomes disabled to a certain extent. She aggravated her condition by a fall on August 12, 1963, when her right leg gave way and her right knee went to the ground. She was examined by Dr. Crenshaw at Campbell's Clinic in Memphis and made five trips to see him. He prescribed certain exercises and gave her a back brace with steel stays to wear. She was wearing this brace daily at the time of the trial and the doctor had given her two of them so she would have a change. Dr. Crenshaw said that she had a permanent partial disability of 15% to her body as a whole, attributable to this injury. She continues to suffer pain and takes from four to ten Excedrin tablets daily. During this period she went to a chiropractor because of her pain. She lost eight weeks from her work of distributing newspapers in bundles to various points for pickup by newsboys and to various stores and display racks. She was paid $33.35 per week for this. While she is doing the same work at higher pay, the newspapers have to be put in smaller bundles for her to handle and her husband has to help her a good bit. Her housework went to pot and she is still unable to do heavy housework, with which her husband and two younger children help. She can't ride in or drive a car except for short distances. Her medical

and hospital bills amounted to $533.64, some of which may have been for other purposes.

We cannot say that these findings do not give sub-stantial support to the jury verdicts.

Finally, appellants contend that there was error in the trial judge's instruction permitting the jury to con-sider the use by Reeves of accumulated sick leave be-cause of these injuries, saying he suffered no loss be-cause his employer paid him. This court has said that an injured party should be entitled to show all the loss he may have sustained as against such a contention, even though the party may have also been compensated to some extent through Workmen's Compensation. *Swindle* v. *Thornton*, 229 Ark. 437, 316 S. W. 2d 202. Regardless of whether the facts in this case are identical, we see no reason why an injured party should not recover as dam-ages for lost leave (whether accumulated sick time or vacation time) for which he is paid by his employer and which he has earned through his employment, as he cer-tainly cannot later claim this time with pay. To say that the possibility that he may never be sick again renders this speculative is not sufficient to bar recovery for such time. We think that the holding of the United States Dis-trict Court in *Beaty* v. *Buckeye Fabric Finishing Co.*, 179 F. Supp. 688, on this point is correct and the Arkan-sas authorities cited there appropriate.

Affirmed.

BYRD, J., dissents.