VERA LONG, Plaintiff-Appellee, v. ILLINOIS POWER COMPANY *et al.*, Defendants and Counterplaintiffs and Counterdefendants-Appellants (Ron L. Keith, d/b/a Keith Ambulance Service, *et al.*, Defendants and Counterdefendants and Counterplaintiffs-Appellees).

Fourth District   No. 4—88—0880

Opinion filed August 17, 1989.

Jerome P. Lyke and Arnold F. Blockman, both of Hatch, Blockman, McPheters, Fehrenbacher & Lyke, of Champaign, for appellants.

Emerson L. Moore, of Lemna, Moore & Carroll, of Tuscola, for appellee Vera Long.

James D. Cottrell, of Phebus, Tummelson, Bryan & Knox, of Urbana, for appellees Ron Keith, Joseph Patton, and City of Villa Grove.

JUSTICE SPITZ delivered the opinion of the court:

Plaintiff Vera Long was injured as a result of a collision between an ambulance in which she was a passenger and a utility truck operated by defendant Robert O. Gallier, an agent and employee of defendant Illinois Power Company (Illinois Power). Also named in plaintiff's lawsuit as defendants were the driver of the ambulance, Joseph C. Patton, the agent and employee of Ron L. Keith, d/b/a Keith Ambulance Service. Keith was present in the ambulance and supervising Patton at the time of the incident. Defendant City of Village Grove (City) is the owner of the ambulance which was leased to Keith.

Illinois Power and the City counterclaimed against each other for property damage to the vehicles. In addition, Illinois Power and Gallier counterclaimed against the remaining defendants for contribution on the plaintiff's personal injury claim. Similarly, Keith, Patton, and the City counterclaimed against Illinois Power and Gallier for contribution on plaintiff's personal injury claim. Gallier also sued Keith, Patton, and the City for Gallier's personal injuries.

After a jury trial conducted in the circuit court of Douglas County, a verdict was returned in favor of plaintiff and against all defendants in the amount of $20,000. The jury apportioned the responsibility to pay the damages as 90% to Illinois Power and Gallier and 10% to the remaining defendants. With regard to property damage, the jury found Illinois Power's damages to be $5,560, but after attributing 90% of the negligence to Illinois Power, awarded only $556. The City's property damage was found to be $22,687.47, and after attributing 10% of the negligence to the City, the jury awarded the City $20,418.72. On the verdict form, concerning the injuries of Gallier, the jury found the total amount of damages suffered by Gallier, without considering reduction of damages due to negligence, to be $0. In attributing negligence, the jury attributed to Gallier 100% of the negligence, ultimately awarding Gallier $0. Judgment was entered on the verdicts on June 30, 1988.

On appeal, Illinois Power and Gallier contend they were entitled to directed verdicts at the close of plaintiff's evidence. They also argue that the apportioning of responsibility to pay plaintiff's judgment on a 90% to 10% basis, as well as the 90% to 10% attribution of comparative negligence on the property damage, were all against the manifest weight of the evidence.

In her case in chief, plaintiff called three occurrence witnesses to testify. Since no issue is raised concerning the medical evidence of plaintiff's injuries, discussion thereof is omitted. The three occur-

rence witnesses called by plaintiff were plaintiff, Keith, and Patton. Plaintiff and Keith were passengers in the ambulance. The ambulance had picked up plaintiff and her husband on the morning of November 23, 1984, the Friday following Thanksgiving. Plaintiff testified she had no warning of the impending collision. Keith stated he felt a deceleration of the vehicle prior to the collision, and he also stated he had no warning of the collision.

Patton's testimony was that on November 2, 1984, a Keith Ambulance Service ambulance was called to the residence of Rex and Vera Long in Camargo, Illinois. The purpose of the call was to assist Mr. Long, who was having trouble breathing. Patton was driving the ambulance when it left the Longs' home. The flashing lights on the ambulance were on when the ambulance arrived at the Long residence, and remained on until the collision which ended the ambulance's journey to Mercy Hospital. The automatic siren on the ambulance was turned on and left on when the ambulance arrived in Urbana. The ambulance traveled to Vine Street in Urbana, to University Avenue, and then proceeded westbound on University Avenue.

Patton looked at the ambulance speedometer after he turned onto University Avenue, and noted that his speed was a little less than 35 miles per hour. Carle Hospital is located about three blocks from the intersection of University Avenue and Lincoln Avenue. At its intersection with Lincoln Avenue, University Avenue has two lanes of through traffic in each direction, and turning lanes for left-hand turns onto Lincoln Avenue. Lincoln Avenue at this same intersection also has two lanes for through traffic in each direction, and turning lanes for left-hand turns onto University Avenue.

As the ambulance approached the intersection of University Avenue and Lincoln Avenue, the ambulance was traveling in the left westbound lane for through traffic. As he approached Lincoln Avenue, Patton noticed that the traffic signal facing him was red. The traffic signal continued in a steady red mode as he proceeded into the intersection. As he approached the intersection, Patton looked to the right and noticed a Carle Clinic van stopped and ready to make a left-hand turn. As he approached the intersection he looked to the left and noticed two vehicles, one in the curb lane making a right-hand turn to go east on University, and the other, an Illinois Power truck, proceeding in the next lane over. When Patton first observed the Illinois Power truck, it was about 150 feet from the intersection with University Avenue. When he next observed the Illinois Power truck it was about 30 feet from the intersection and still moving. After noticing the Illinois Power truck the second time, he looked to

the right and then collided with the truck. Patton does not recall touching the brake pedal before the impact with the Illinois Power vehicle. When later called as an adverse witness by Illinois Power, Patton estimated the speed of the ambulance was about 25 miles per hour immediately before the collision.

The ambulance came into contact with the Illinois Power vehicle around the back of the door on the passenger's side and in the utility bed. After the collision, the ambulance turned onto its left side, and the truck was propped up against the front of the ambulance, not turned over, but elevated some off the road. The ambulance and the Illinois Power vehicle slid into the Carle Clinic van which was waiting to make a left turn.

At the close of the plaintiff's evidence, Illinois Power and Gallier moved for directed verdicts. The motions were denied.

Gallier was the driver of the Illinois Power vehicle involved in the collision. He was a gas service man for Illinois Power and his vehicle was proceeding north on Lincoln Avenue. Gallier had received a call at approximately 11:30 a.m. Gallier had the windows rolled up in his vehicle. The heater was on low setting, with the fan running. The two-way radio for emergency calls was on in accordance with the instructions of the power company. There was no other type of radio in the vehicle. As he was proceeding north on Lincoln Avenue, Gallier was traveling approximately 20 to 25 miles per hour. He was traveling in the left of the two northbound lanes of through traffic.

Between a block and a half block before the intersection of Lincoln Avenue and University Avenue, Gallier looked at the light at the intersection and noticed it was green. He looked to the right as he approached the intersection and did not see the ambulance. There was a vehicle traveling to the right of the Illinois Power vehicle and there were quite a few cars parked in the parking lot of a repair garage at the southeast corner of the intersection. As Gallier entered into the intersection, the traffic control signal for him was green. Looking east on University Avenue, there is a dip in the road between Carle Hospital and Lincoln Avenue.

When he first saw the ambulance, he was in the middle of the intersection, going into the westbound lanes of traffic of University Avenue. At that time, the ambulance was maybe 30 feet away. He heard the ambulance siren before he saw the ambulance, and when he heard the siren he first looked to the left, not realizing from which direction the sound of the siren was coming. When Gallier looked to the right and saw the ambulance, the first thing he did was shove the accelerator to the floor, hoping he might be able to avoid

the ambulance by passing in front of it.

The ambulance siren had a high shrill pitch, which, in the opinion of Gallier, did not seem to penetrate as well as the siren which he had heard on ambulances of another ambulance company which alternates "loud and low, loud and low." Gallier testified he never had trouble hearing this other type of siren through the sound of the two-way radio.

Patton testified that there were three different modes in which the siren could have been set. In response to the question "Isn't there some type of mode where you can attract more attention to yourself?" Patton answered, "I suppose there is, or it would." He further testified he sometimes puts the siren in the mode which attracts more attention when he goes into an intersection with traffic, and he particularly does so when he goes into heavily traveled intersections. Although the intersection of University and Lincoln is a busy intersection, Patton did not recall having changed the siren mode as he approached the intersection.

Patton testified he could have stopped the ambulance when he saw the Illinois Power vehicle the first time, and he probably could have stopped when he saw the vehicle the second time. He would have upset some people in the ambulance, but he could have stopped the second time. Patton assumed that the Illinois Power vehicle would stop.

As a result of the collision, a gas explosive meter, a fire extinguisher, and a first aid kit broke loose from their mountings in the Illinois Power vehicle and flew inside the cab. One of these items struck Gallier in the right hand as he gripped the steering wheel, injuring a knuckle on one of the fingers. After the collision, Gallier was taken to the emergency room at Mercy Hospital. At the emergency room, a gash on the top of Gallier's head was stitched. Hospital personnel also treated a cut on his lower leg and X-rayed his hand. At the emergency room, Gallier noticed that his right hand was swollen, that two of his fingers were partially numb and very cold, and that there was a knot on his knuckle. The knot was still there at the time of the trial. He was released from the hospital the afternoon of the accident, and upon arriving at home, he noticed a solid mass of bruises from his waist to his shoulders. He was so sore he could hardly move.

After being home for about four or five days he went to Dr. Charles R. Shepardson. Gallier noticed his leg was so swollen he could not pull his pants over it, and it also was bleeding quite a bit. His hand was swollen, his fingers were numb and cold, and Gallier

could not make a fist or close his hand. Gallier had never had a problem with this hand prior to the accident. Gallier was later attended to by Dr. Ralph E. Samuelson and Dr. Milton R. Carlson, and he took physical therapy for his hand three days a week for four to five weeks at Christie Clinic. He was medically restricted for work from the day of the accident through March 21, 1985. He also missed work on April 17, May 7, May 8 through 18, and May 21 and 22, and July 3, 1985. The total hours missed was 733. Gallier's hourly rate was $13.71. All of the hours missed were considered by Gene Peters, Gallier's supervisor, to be from an on-the-job injury. Gallier was not paid for those 733 hours.

The problems with his head, his leg, and his chest subsequently cleared up, but at the time of the trial, Gallier was still experiencing problems with his right hand, including a knot on the knuckle. Gallier was experiencing pain in his hand practically all the time.

Shepardson testified he saw Gallier on November 30, 1984, and noted a "long severe abrasion on his right shin which was very tender and swollen." In his opinion the abrasion resulted from the accident on November 23, 1984. As of December 28, 1984, the leg had improved, but Shepardson noted that the hand was quite swollen and painful. On March 28, 1985, Shepardson noted that Gallier's hand was definitely worse. He had had a lot of pain in his hand for the preceding three months and had been cared for by Carlson, who had taken X rays and prescribed physical therapy. Shepardson particularly noted during this visit that Gallier had swelling of the major knuckle of the middle finger. Furthermore, his shin had become more painful and was giving him trouble. Shepardson testified that, in his opinion, to a reasonable degree of medical certainty, the condition which he observed on March 28, 1985, was consistent with sympathetic reflex dystrophy. With sympathetic reflex dystrophy, pain affects the sympathetic discharge, possibly by spasm of blood vessels, so that an extremity is painful, somewhat swollen, and shiny, generally lacking in normal sweating. The condition also often involves muscle atrophy. Sympathetic reflex dystrophy was considered because of pain and swelling persisting so long after the accident.

Samuelson testified he first saw Gallier on January 4, 1985. On that occasion he observed pain, swelling, weakness, and limitation of motion in his right hand. On May 7, 1985, Gallier complained to Samuelson of a problem with his right leg. The last time Samuelson saw Gallier was on July 3, 1985. At this last visit, Samuelson diagnosed "status post reflex sympathetic dystrophy, right hand with mild residual grip weakness improved. Minimal bilateral lower ex-

tremity varicosities, left greater than right. Venous statis dermatitis minimal, right leg resolved. Cutaneous excoriations right anterior tibial surface, probably due to scratching during sleep, resolved." Samuelson opined that the trauma on November 23, 1984, was sufficient to cause the diagnosed conditions, that the right leg problem was caused or might have been caused by the trauma and that the contusion caused swelling, which caused stasis in the circulation.

Carlson testified regarding his treatment of Gallier. Carlson first saw Gallier on January 14, 1985. Gallier was referred to Carlson for evaluation for complaints of right hand disability, weakness, and swelling. Upon examination of Gallier on this occasion, Carlson diagnosed Gallier as suffering from reflex sympathetic dystrophy and disuse atrophy. Carlson recommended Gallier receive physical therapy at Christie Clinic. Later, Carlson saw Gallier on March 21, 1985, and at that time released him to return to work. The last time Carlson saw Gallier was on July 17, 1987, and at that time Carlson diagnosed Gallier as suffering from a continuing reflex sympathetic dystrophy of a mild nature. Carlson testified that in his opinion, to a reasonable degree of medical certainty, Gallier's medical problem might or could have resulted from the accident of November 1984.

As a result of the collision, Gallier incurred medical bills, not including bills for prescriptions, in the amount of $1,343.09. Of this amount, $236.25 was for emergency room service right after the accident, and $123 was for the ambulance which took Gallier from the accident scene to the emergency room. The bills were admitted into evidence without objection.

Arlo Blaine Austin testified that, on the morning of the collision, he was driving an automobile westbound on University in the right lane near the intersection with Lincoln. He pulled to the right and stopped because of the ambulance coming from behind him. There were no cars in front of him and he witnessed the collision. He observed the traffic light for the ambulance was red and the speed of the ambulance was 25 to 35 miles per hour. He did not observe either vehicle slow down prior to impact, although he did not observe the Illinois Power vehicle sufficiently before impact to estimate its speed. Impact occurred in the middle of the intersection with the ambulance hitting the power truck just behind the cab.

Joanne Marie Gunther was making a phone call at a phone booth on Lincoln and during the conversation observed both vehicles approach the intersection. The light for the power truck was green and the truck was traveling between 25 and 30 miles per hour. The light for the ambulance was red, and the ambulance was traveling be-

tween 35 and 40. She did not see flashing lights. She did not see the ambulance slow down. She could not positively state which lanes the vehicles were in and she did not hear the siren until the ambulance got to the intersection. While she stated the power truck was first in the intersection, this witness nevertheless stated the power truck struck the ambulance. She testified the truck tried to avoid the collision by swerving to the left. She observed the ambulance two seconds before the collision.

Dennis Schmidt was the operator of the Carle Clinic vehicle at the intersection at the time of the collision. Schmidt described the intersection as having a parking lot for an auto parts store on the southeast corner, a donut shop on the southwest corner, and no buildings on either of the northern corners. Schmidt was in the turning lane, preparing to turn to proceed eastbound on University. He had a green light. He was facing south. Having heard the siren, his attention was drawn to the approaching ambulance, which was 200 to 300 feet from the intersection at that time. He also observed flashing lights. The siren and lights were on continuously. He also observed the power truck northbound on Lincoln. Because it was coming straight at him it was hard to judge the speed, but he thought it was probably going 20 to 25 miles per hour. Schmidt noticed other vehicles approaching the intersection from the west pulling over to the curb.

The collision occurred in the northeast quadrant of the intersection, right in front of the westbound lanes of University. He does not recall either vehicle slowing down. The truck did not take any evasive action or change its pattern. He first saw the power truck when it was about 200 feet from the intersection.

Schmidt had an opportunity to observe the driver operating the truck as the truck approached the intersection and he did not see the driver look to the right or left as he approached the intersection. The driver of the truck was looking straight ahead. At impact, Schmidt was looking at the power truck. This is normally a fairly busy intersection, but Schmidt did not recall it being particularly busy at the time of the occurrence.

■■ ■ The trial court may direct a verdict when all the evidence, viewed most favorably to the nonmoving party, so overwhelmingly favors the party moving for a directed verdict that no contrary verdict based on the evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504; *Loitz v. Remington Arms Co.* (1988), 177 Ill. App. 3d 1034, 532 N.E.2d 1091.) In a negligence case, the plaintiff has the burden of proving the defend-

ant's negligence by a preponderance of the evidence. Merely because an accident occurred does not raise a presumption defendant was negligent. Negligence is shown when defendant is proved to have failed to exercise that standard of care which a reasonably prudent person would have exercised under the circumstances exhibited by the evidence in the case. (*Lukasik v. Hajdas* (1968), 104 Ill. App. 2d 1, 244 N.E.2d 404.) There can be no recovery unless plaintiff proves, as a fact, that defendant breached a duty owed to plaintiff and that the breach of the duty was the proximate cause of plaintiff's injuries. (*Whitman v. Lopatkiewicz* (1987), 152 Ill. App. 3d 332, 504 N.E.2d 243.) Under ordinary circumstances, violation of traffic control laws constitutes *prima facie* evidence of negligence in civil actions arising from a collision involving the violation of such laws. However, the operation of emergency vehicles is an exception to the rule. *Mayfield v. City of Springfield* (1982), 103 Ill. App. 3d 1114, 432 N.E.2d 617.

■■ The relevant portions of sections of the Illinois Vehicle Code (Code) (Ill. Rev. Stat. 1987, ch. 95½, par. 1—100 *et seq.*) follow. Section 11—306 concerns the obligation of motorists to obey traffic control signals:

"Whenever traffic is controlled by traffic-control signals exhibiting different colored lights or color lighted arrows, successively one at a time or in combination, only the colors Green, Red and Yellow shall be used, except for special pedestrian signals carrying a word legend, and the lights shall indicate and apply to drivers of vehicles and pedestrians as follows:

(a) Green indication.

1. Vehicular traffic facing a circular green signal may proceed straight through or turn right or left unless a sign at such place prohibits either such turn. Vehicular traffic, including vehicles turning right or left, shall yield the right of way to other vehicles and to pedestrians lawfully within the intersection or an adjacent crosswalk at the time such signal is exhibited.

\* \* \*

(c) Steady red indication.

1. Except as provided in paragraph 3 of subsection (c) of this Section [right turn on red], vehicular traffic facing a steady circular red signal alone shall stop at a clearly marked stop line, but if there is no such stop line, before entering the crosswalk on the near side of the intersection, or if there is no such crosswalk, then before entering the intersection, and shall remain standing until an indication to proceed is shown." (Ill.

Rev. Stat. 1987, ch. 95½, pars. 11—306(a)(1), (c)(1).)

In section 11—205, exceptions are made for emergency vehicles, however:

"(c) The driver of an authorized emergency vehicle may:
\* \* \*

2. Proceed past a red or stop signal or stop sign, but only after slowing down as may be required and necessary for safe operation;
\* \* \*

(d) The exceptions herein granted to an authorized emergency vehicle, other than a police vehicle, shall apply only when the vehicle is making use of either an audible signal when in motion or visual signals meeting the requirements of Section 12—215 of this Act.

(e) The foregoing provisions do not relieve the driver of an authorized emergency vehicle from the duty of driving with due regard for the safety of all persons, nor do such provisions protect the driver from the consequences of his reckless disregard for the safety of others." (Ill. Rev. Stat. 1987, ch. 95½, pars. 11—205(c)(2), (d), (e).)

An ambulance carrying a stricken individual to a hospital is defined as an emergency vehicle for purposes of the Code. (Ill. Rev. Stat. 1987, ch. 95½, par. 1—105.) Section 11—907(a) concerns the operation of other vehicles upon the approach of an emergency vehicle:

"(a) Upon the immediate approach of an authorized emergency vehicle making use of audible and visual signals meeting the requirements of this Code or a police vehicle properly and lawfully making use of an audible or visual signal,

(1) the driver of every other vehicle shall yield the right-of-way and shall immediately drive to a position parallel to, and as close as possible to, the right-hand edge or curb of the highway clear of any intersection and shall, if necessary to permit the safe passage of the emergency vehicle, stop and remain in such position until the authorized emergency vehicle has passed, unless otherwise directed by a police officer \* \* \*." Ill. Rev. Stat. 1987, ch. 95½, par. 11—907(a)(1).

Illinois Power relies on two cases, *Mayfield* and *Graham v. Glass* (1972), 7 Ill. App. 3d 988, 288 N.E.2d 617. In *Graham*, judgment *n.o.v.* was entered for a defendant who stopped his vehicle about four feet over the center line of the street in which a police officer's motorcycle was traveling with siren on and red lights flashing. Basically, the court concluded that, under the circumstances, defendant

had stopped, yielding the right-of-way as best the driver could and therefore was not negligent. In *Mayfield*, the reviewing court said judgments *n.o.v.* should have been entered for plaintiffs where the evidence was that a police officer driving an emergency vehicle, with flashing lights and siren activated, proceeded into an intersection against a red light even though his vision was obstructed by a school gymnasium, stopped vehicles, and the setting sun in the officer's eyes. The vehicle struck by the one operated by the officer was stopped or slowed about to a stop waiting to make a left turn and had a green light to proceed. This court stated that had the non-emergency vehicle proceeded to move as closely as possible to the right-hand curb as required by statute, then an ever greater danger would have been created than in fact occurred by the driver stopping where she was.

In both of these cases, the driver who was supposed to yield the right-of-way had actually stopped the nonemergency vehicle, *albeit* in the intersection. In the case at bar, the power truck did not yield the right-of-way, or stop. It would seem, therefore, that the trial court's refusal to direct a verdict was proper.

■ As to to manifest weight issue, defendants concede that, since the trier of fact is in a better position to observe the witnesses, assess their credibility, weigh the evidence, and resolve conflicts therein, a reviewing court's judgment will not ordinarily be substituted for the judgment of the trier of fact unless the verdict or judgment is against the manifest weight of the evidence. In *Loitz v. Remington Arms Co.* (1989), 177 Ill. App. 3d 1034, 532 N.E.2d 1091, the verdict or judgment is against the manifest weight of the evidence only if a contrary conclusion is clearly evident, plain, or indisputable. *Harris v. Day* (1983), 115 Ill. App. 3d 762, 451 N.E.2d 262.

■ Here the jury found Illinois Power and its driver 90% responsible for plaintiff's personal injuries and assigned 10% responsibility to the ambulance service and its driver. The same percentages were applied to findings of comparative fault for the property damage claims. Defendants do not suggest what percentages should have been assigned except to say 10% was too low for Patton and 90% too high for Gallier. However, under the facts of this case it would not appear that an increase of fault or responsibility to Patton and a decrease of Gallier's fault or responsibility as defendant suggests would be clearly evident, plain, or indisputable.

Defendants cite *Bouhl v. Smith* (1985), 130 Ill. App. 3d 1067, 475 N.E.2d 244, in which the reviewing court, after reciting that drivers of emergency vehicles are held to ordinary standards of care deter-

mined by what a reasonable, prudent driver would do, determined that the trial court should have granted a directed verdict on liability to the plaintiff driver of the nonemergency vehicle. In *Bouhl*, plaintiff's vehicle was stopped at the end of a line of traffic approaching an intersection. The officer activated his siren and lights and attempted to go around this line of traffic in the oncoming lane. However, seeing a vehicle enter the roadway heading towards him, the officer attempted to swerve back into the proper lane of traffic, braked, and skidded into plaintiff's truck. The pavement was wet and slippery at the time, the shoulders of the road were too narrow to permit vehicles to travel on them, the officer knew the intersection was busy at the time of day, the speed limit was 45 miles per hour, the collision occurring at 35 miles per hour, and the impact was 220 feet from the stop sign. *Bouhl* is clearly factually distinguishable from the case at bar.

The next issues we are asked to consider are whether Gallier is entitled to a new trial by reason of the jury's finding zero damages for his personal injuries because such a finding is inadequate as a matter of law, and whether a new trial is warranted by the apparent inconsistencies in the verdicts as to the apportionment of fault. The Illinois Supreme Court has stated that a jury's verdict is to be examined so as to ascertain the jury's intention and, in the event the verdict is otherwise supportable, then the verdict is to be molded into form and made to serve unless the reviewing court has doubts as to the verdict's meaning. (*Manders v. Pulice* (1970), 44 Ill. 2d 511, 256 N.E.2d 330.) Certainly the Gallier verdict raises a number of questions as to exactly what the jury had in mind. It was clearly a very complex case, with a number of counterclaims to consider, including claims for contribution. The jury had a difficult task.

Concerning the issue of inadequate damages, the law is succinctly summarized in *Tipsword v. Johnson* (1978), 59 Ill. App. 3d 834, 836, 376 N.E.2d 85, 87:

"Courts have traditionally been reluctant to interfere with the determination of the jury in awarding damages as long as the award is within the range of the evidence, the instructions proper, and there is no improper exclusion of evidence. (*Brown v. St. John's Hospital* (1977), 51 Ill. App. 3d 1044, 367 N.E.2d 155.) Additionally, if there appears to be evidence suggesting a genuine conflict as to the legitimacy of the expenses incurred, then the verdict of the jury should not be disturbed on review. (*Haleem v. Onate* (1966), 71 Ill. App. 2d 457, 219 N.E.2d 94.) Nevertheless, a court will intercede in the jury's assessment of

damages where the award is palpably inadequate, or it is clear that proof of an element of damages has been ignored, or it is shown to be erroneous or the result of passion or prejudice, or where it clearly appears from the uncontradicted evidence that the amount of the verdict bears no reasonable relationship to the loss suffered by the plaintiff. *First National Bank v. Szwankowski* (1969), 109 Ill. App. 2d 268, 248 N.E.2d 517."

In this case there is no contention that the jury was not properly instructed as to Gallier's counterclaim for personal injuries. In *Tipsword*, this court held that even though the jury might well have believed plaintiff's later claims were exaggerated or overtreated, an award of zero damages for injuries arising from an automobile collision was inadequate where it would be against the manifest weight of the evidence to find plaintiff had time to plan a scheme to feign injuries, medical assistance was sought immediately following a collision involving an impact of substantial force, and plaintiff experienced pain after impact.

In the case at bar, a jury verdict form was utilized which required the jury to register two findings of fact on the form before assessing the final award, if any. The first finding was the amount of damages which Gallier sustained without regard to any possible negligence on his part. In this section, the jury registered "0" damages. For the same reasons relied on in *Tipsword*, this finding is inadequate. But this does not necessarily mean the ultimate decision to award Gallier zero damages is inadequate.

On the verdict form, the jury also found that Gallier was 100% at fault for the collision. Obviously, if the second finding is proper, then the ultimate award of zero damages is also correct. However, Gallier and Illinois Power argue that the finding of 100% fault is inconsistent with the findings on the property damage claim in which the responsibility was attributed 90% to Gallier and Illinois Power and 10% to Patton, the City, and the ambulance service.

■■ ■ Ordinarily, verdicts which are legally inconsistent with each other should be set aside and a new trial granted. (*Wottowa Insurance Agency, Inc. v. Bock* (1984), 104 Ill. 2d 311, 472 N.E.2d 411.) There does not appear to be a rational basis for the jury's actions. As this court noted in *Ogg v. Coast Catamaran Corp.* (1986), 141 Ill. App. 3d 383, 490 N.E.2d 111, comparative negligence law does not require the application of the same percentage as applied in the contribution action. The question here, however, is not merely a question of the comparison of the division of contribution and the fault of comparative negligence. The jury considered the property damage

claims and Gallier's personal injury claim on the basis of comparative negligence and still made what appears to be inconsistent findings. It is clear the jury was confused by the complexity of the case. However, the inconsistency of some of the verdicts does not require reversal of the entire case.

Since plaintiff does not appeal her award and since, as already noted, there does not appear to be a reason to reverse the plaintiff's award, the inconsistency does not affect the plaintiff's judgment, and under *Ogg*, it also does not affect the contribution between defendants.

In this case, the only issue which needs to be retried is the issue of Gallier's damages. On remand, after a jury has documented the amount of damages Gallier sustained without regard to any possible negligence on Gallier's part, the trial court is directed to apportion 90% of the fault to Gallier as has already been determined by the jury to be appropriate and which has been determined herein to be supported by the evidence.

The last issue to consider in this case is whether the trial court erred in not allowing the jury to consider whether the ambulance service was a common carrier and therefore bound to a higher standard of care to plaintiff. Illinois Power argues the ambulance was a common carrier, owing a higher degree of care to plaintiff, its passenger, and the jury should have been so instructed so as to properly consider the degree of fault attributable to every party. The City, ambulance service, and Patton contend the ambulance was a private carrier. This seems to be an issue of first impression in Illinois.

▆▆ The question of whether an ambulance is a common carrier has recently been addressed in the annotation, *Liability of Operator of Ambulance Service for Personal Injuries to Person Being Transported* (Annot., 68 A.L.R.4th 14 (1989), superseding Annot., 21 A.L.R.2d 910 (1952)). Courts in several States have recognized ambulances, as common carriers, have a duty to exercise the highest degree of care for the passenger during carriage. It would appear that the modern trend seems to be toward finding ambulances to be common carriers.

A common carrier, generally, is a carrier hired to carry any person who applies for passage as long as there is room available and there is no legal excuse for refusing. (6 Ill. L. & Prac. *Carrier* §351 (1954).) Ordinarily, a common carrier must accept as a passenger any person offering himself or herself for passage at the proper time and in the proper manner and who is able and willing to pay the fare. 6 Ill. L. & Prac. *Carrier* §352 (1954).

The distinction between common carrier and private carrier is discussed in §§ 1 to 9 of American Jurisprudence 2d (13 Am. Jur. 2d *Carrier* secs. 1 through 9 (1964).) To be a common carrier, one must hold himself out to be: (1) engaged in the business of transport, although this need not be the exclusive occupation and the person or corporation endeavoring to provide such service need not own the means of transportation; (2) in this case the business must be to transport persons, as opposed to freight; (3) obviously the transport is from place to place, but there need not be a fixed route or movement between fixed termini; (4) the transport must be undertaken for compensation, although the contract need not be expressed or the rate fixed, but a gratuity or gift is generally not sufficient to make one a common carrier; and (5) the services must be offered to the public generally. A common carrier cannot become a private carrier merely by some special agreement with the persons arranging the transportation, but this can occur if a common carrier transports something which would not ordinarily be carried in his business. Conversely, in Illinois, it has been determined that a private carrier cannot be transformed into a common carrier merely because a passenger is incidentally transported. For example, a private carrier is not considered a common carrier merely because the owner of a horse being transported wanted to ride along. (*Miller v. Miller* (1946), 395 Ill. 273, 69 N.E.2d 878.) Section 8 (13 Am. Jur. 2d *Carrier* §8, at 565 (1964)) discusses private carriers:

"A private carrier is one who, without making it a vocation, or holding himself out to the public as ready to act for all who desire his services, undertakes, by special agreement in a particular instance only, to transport property or persons from one place to another either gratuitously or for hire. Private carriers are distinguished from common carriers in respect of (1) the obligation to carry and (2) the liability for loss or injury. Private carriers do not undertake to carry for all persons indiscriminately but transport only for those with whom they seem fit to contract, and are liable for only such loss or injury as results from a failure to exercise ordinary care, whereas common carriers undertake to carry any and all members of the public who desire such service, and are liable as insurers for the loss or injury of property, with certain exceptions, and for injuries to passengers resulting from a failure to exercise the highest degree of practicable care and diligence consistent with the mode of transportation and the normal prosecution of the carrier's business.

What constitutes a common or a private carrier is a question of law, but whether a carrier is actually serving as a private, rather than a common, carrier is a question of fact. Whether a particular transportation service is undertaken in the capacity of a private or of a common carrier must be determined by reference to the character of the business actually carried on by the carrier, and also by the nature of the service to be performed in the particular instance."

The parties cite only two Illinois cases for this court to consider, *Meyer v. Rozran* (1948), 333 Ill. App. 301, 77 N.E.2d 454, and *Beatrice Creamery Co. v. Fisher* (1937), 291 Ill. App. 495, 10 N.E.2d 220. These cases confirm that the law of Illinois is the same as the general law recited above. *Beatrice Creamery* emphasized that the true test of whether a party is a common carrier is whether the service is available to all of the public who apply for carriage.

■■ In this case, however, we need not decide whether, under the law of Illinois, an ambulance is a common carrier generally. The plaintiff in this case was not the patient, the person to whom ambulance service is ordinarily provided. Plaintiff was merely riding in the ambulance incidental to the carriage of her husband as an apparent convenience to plaintiff, who would otherwise have had to find some other means of transportation to the hospital. As to this plaintiff, the ambulance service is not a common carrier. See *Perrine v. Charles T. Bisch & Son* (1952), 346 Ill. App. 321, 105 N.E.2d 543.

Accordingly, the judgment of the circuit court of Douglas County is affirmed in all respects, except the judgment on the Gallier counterclaim for personal injuries is reversed and the cause is remanded for further proceedings consistent with the directions contained in this opinion.

Affirmed in part; reversed in part and remanded with directions.

LUND and GREEN, JJ., concur.