2015 COA 128

**Karen BEDEE, Plaintiff–Appellant,**

v.

**AMERICAN MEDICAL RESPONSE OF COLORADO, Defendant–Appellee.**

**Court of Appeals No. 14CA1699**

Colorado Court of Appeals,
Div. A.

Announced September 10, 2015

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24-51-1105, C.R.S. 2014.

Melat, Pressman & Higbie, LLP, Alanson Higbie, Colorado Springs, Colorado, for Plaintiff–Appellant.

DAGNER %CO SCHLUTER %CO MITZNER %CO WERBER, LLC, Leslie L. Schluter, Greenwood Village, Colorado, for Defendant–Appellee.

Opinion by CHIEF JUDGE LOEB

¶ 1 In this negligence action, plaintiff, Karen Bedee, appeals from the judgment entered on a jury verdict finding that defendant, American Medical Response of Colorado (AMR), was not negligent and did not cause her injuries suffered when an ambulance in which she was a passenger hit several unmarked dips in the road. Bedee contends that the trial court erred in rejecting her tendered jury instruction, which stated that an ambulance driver must exercise the highest possible degree of care. We conclude that, under the circumstances here, the trial court did not err in rejecting Bedee's tendered instruction. Accordingly, we affirm the judgment.

## I. Background

¶ 2 Bedee was a member of a medical team from St. Francis Medical Center transporting a neonate in an ambulance owned by AMR from St. Francis in Colorado Springs to a Denver children's hospital. Bedee was also in the ambulance on the return trip to Colorado Springs after the patient was delivered to the Denver hospital. The operators of the ambulance were employees of AMR.

¶ 3 Throughout the trip, Bedee was a passenger in the back of the ambulance. The rear compartment of the ambulance was equipped with seat belts (lap belts only) for use by the occupants. The passengers in the rear compartment were separated by a partition with an opening from the cab where the driver and the other operator sat. The opening was large enough for the rear compartment passengers and the cab occupants to speak with each other and for the rear passengers to see through the front windshield.

¶ 4 On the return trip to Colorado Springs, the ambulance allegedly hit a series of dips in the road. Testimony at trial was conflicting as to whether these dips were so harsh as to cause the isolette used to transport the neonate to dislodge. Bedee alleged that these dips dislodged the isolette and also jostled the rear passengers. She asserted that when the ambulance hit the dips, she was lifted off of her seat and slammed back down, which caused her lower back to twist and torque. Bedee contended that the AMR operators of the ambulance were negligent because they did not slow down when hitting the dips, and that she saw the driver looking at or using some type of device while driving. Bedee also alleged that the return trip had several abrupt stops or "short stops." She sought damages for a lower back injury that resulted in lower back pain, spasms, and disability.

¶ 5 Before trial, Bedee submitted a trial brief arguing that the facts of this case required that an instruction be given to the jury stating that the ambulance operators owed its passengers the highest degree of care under the test set forth *Lewis v. Buckskin Joe's*, 156 Colo. 46, 396 P.2d 933 (1964), because of AMR's control over the ambulance and Bedee's lack of freedom of movement during the ride. AMR filed a rebuttal brief noting that ambulances are not common carriers under a Colorado statute and, therefore, the higher degree of care should not apply. At the jury instruction conference, Bedee objected to the ordinary negligence and standard of care instructions, and tendered an instruction stating that an ambulance driver must exercise the highest possible care. The trial court rejected Bedee's

tendered instruction, concluding that a higher standard of care was not applicable in this case; instead, the court gave the ordinary negligence and standard of care instructions.

¶ 6 At trial, evidence established that Bedee was wearing her lap belt on the return trip. According to her testimony, the ambulance was traveling at what seemed to her to be normal speeds as it left Denver and there was no change in speed or driving when the driver was allegedly looking at the device. AMR's documentary evidence from the ambulance's onboard recorder showed the speeds and G-forces of the ambulance during the return trip. These exhibits also indicated that the ambulance was traveling without emergency lights or sirens, that no abnormal G-forces were experienced during the trip, and that at the relevant times, the ambulance never exceeded a 0.2 gravitational force. AMR also admitted into evidence a data summary for the entire ambulance trip that was created by the onboard record system, which indicated that there were no hard accelerations or decelerations during the trip and no instances where the ambulance exceeded the speed limit (defined as exceeding the limit for more than ten seconds).

¶ 7 After the jury was instructed with the ordinary negligence and standard of care instructions, it returned a verdict in favor of AMR, finding that, although Bedee had injuries, AMR did not act negligently and did not cause those injuries.

¶ 8 Bedee now appeals, contending that the trial court reversibly erred in rejecting her proffered instruction on the highest standard of care and in giving the ordinary "reasonable person" standard of care instruction. We disagree.

II. Standard of Review

 ¶ 9 Trial courts have a duty to correctly instruct juries on all matters of law. *Day v. Johnson*, 255 P.3d 1064, 1067 (Colo. 2011). A court reviews de novo whether a particular jury instruction correctly states the law. *Id.* As long as the instruction properly informs the jury of the law, a trial court has broad discretion to determine the form and style of jury instructions. *Id.* Therefore, we review a trial court's decision to give a

particular jury instruction for an abuse of discretion. *Id.* "A trial court's ruling on jury instructions is an abuse of discretion only when the ruling is manifestly arbitrary, unreasonable, or unfair." *Id.* A court can also abuse its discretion when its decision rests on a misunderstanding or misapplication of the law. *Sinclair Transp. Co. v. Sandberg*, 2014 COA 75M, ¶ 26, 350 P.3d 915.

### III. Applicable Law

¶ 10 The sole issue in this appeal is whether the ambulance operators in this case (and thus, AMR based on vicarious liability) should be held to the highest standard of care. No Colorado appellate court has addressed the issue whether ambulance operators are subject to the highest standard of care. Accordingly, we begin by discussing the situations and circumstances where Colorado and other jurisdictions have applied the "highest degree of care."

#### A. Negligence and Standard of Care

¶ 11 A negligence claim has four elements: a duty owed by the defendant to the plaintiff, a breach of that duty, injury to the plaintiff, and a proximate cause relationship between the breach and the injury. *Casebolt v. Cowan*, 829 P.2d 352, 356 (Colo. 1992). Thus, "[a] cause of action in tort arises out of a violation of a legal duty imposed upon an actor to avoid causing harm to others." *United Blood Servs. v. Quintana*, 827 P.2d 509, 519 (Colo.1992). A legal duty is defined in terms of a standard of care. *Id.* "The source of the duty and the corresponding standard essential to the proper discharge of the duty may originate from a judicial decision or a legislative enactment." *Id.*

¶ 12 Colorado cases espouse the general principle that a legal duty to use reasonable care arises in response to a foreseeable and unreasonable risk of harm to others. *Id.* In Colorado personal injury cases, negligence is defined as a failure to do an act which a reasonably careful person would do, or the doing of an act which a reasonably careful person would not do, under the same or similar circumstances to protect oneself or others from bodily injury.

*Lombard v. Colo. Outdoor Educ. Ctr.*, 266 P.3d 412, 415 (Colo.App.2011); *see* CJI–Civ. 4th 9:6 (2015). Thus, "in ordinary negligence cases, an actor is required to conform his or her conduct to a standard of objective behavior measured by what a reasonable person of ordinary prudence would or would not do under the same or similar circumstances." *Quintana*, 827 P.2d at 519.

¶ 13 Under the "reasonable person standard," "the greater the risk, the greater the amount of care required to avoid injury to others." *Imperial Distrib. Servs., Inc. v. Forrest*, 741 P.2d 1251, 1254 (Colo. 1987). Hence, what constitutes reasonable care varies according to the degree of risk associated with the activity in question. *Id.* An increased risk is therefore necessarily a prerequisite to imposing a higher degree of care on the defendant. *Bayer v. Crested Butte Mountain Resort, Inc.*, 960 P.2d 70, 73 (Colo.1998) (the amount of care demanded by the standard of reasonable conduct must be in proportion to the risk); *Imperial Distrib. Servs., Inc.*, 741 P.2d at 1254.

¶ 14 As a result, certain activities are subject to a higher standard of care, commonly referred to as the "highest degree of care." *Imperial Distrib. Servs., Inc.*, 741 P.2d at 1254–55. But, only in limited circumstances have reviewing courts determined that an instruction on the highest degree of care is required. *Id.* at 1255. "It is only where all minds concur that the defendant is engaged in an activity that poses a high risk of injury to others that the court, as a matter of law, may instruct the jury to hold the defendant to the highest standard of care." *Id.*

#### B. *Lewis* Test and Inherently Dangerous Activities

¶ 15 In *Lewis*, 156 Colo. at 57, 396 P.2d at 939, the supreme court articulated a test for determining when an allegedly negligent defendant is held to the highest degree of care. That test is applied when: (1) passengers give up their freedom of action and movement, surrendering themselves to the care and custody of the defendant operator; (2) there is usually nothing the passengers

can do to cause or prevent the accident; and (3) the defendant operator has exclusive possession and control of the facility used in its business. *Bayer,* 960 P.2d at 73; *Summit Cnty. Dev. Corp. v. Bagnoli,* 166 Colo. 27, 40, 441 P.2d 658, 664 (1968).

¶ 16 The *Lewis* factors have been applied in Colorado only to ski lift operators and operators of amusement rides.[1] The supreme court has stated that the underlying basis for its decision determining that ski lift operators are subject to the highest degree of care was that ski lifts "are operated at considerable height from the ground over rough, elevated, often precipitous Colorado terrain. A fall from the lift can be calamitous. Passengers entrust their safety to the lift operators. Operation of a ski lift thus entails both greater danger and greater responsibility than circumstances involving ordinary care." *Bayer,* 960 P.2d at 73.

¶ 17 Separate from, but similar to, the concept of increased risk for passengers encompassed by the *Lewis* factors is the common law concept of inherently dangerous activities. In Colorado, cases involving inherently dangerous activities seem to center around certain consumables offered by a business: " '[G]reater care may be required of one who dispenses a product in the stream of commerce when the product itself, by virtue of its inherent character, poses a high risk of injury to others.' " *Imperial Distrib. Servs., Inc.,* 741 P.2d at 1254–55 (quoting *Blueflame Gas, Inc. v. Van Hoose,* 679 P.2d 579, 588 (Colo.1984)).

¶ 18 The trial court may instruct a jury on the highest degree of care in such cases only where " 'all minds concur' " that a business, by its very nature is " 'fraught with peril to the public.' " *Id.* at 1255 (quoting

*Denver Consol. Elec. Co. v. Simpson,* 21 Colo. 371, 377, 41 P. 499, 501 (1895)). Notably, " '[w]here the facts of a case naturally lead equally intelligent persons honestly to entertain different views as to the degree of care resting upon a defendant, the court ought not to lay down a rule prescribing any particular or specific degree in that case.' " *Id.* (quoting *Simpson,* 21 Colo. at 377, 41 P. at 501).[2]

## C. Common Carrier

¶ 19 Another analytical approach to holding that a defendant must exercise the highest degree of care is the common law concept that a defendant's status as a common carrier 'creates a duty to exercise the highest degree of care to its passengers. *Colo. Civil Rights Comm'n v. ConAgra Flour Mill. Co.,* 736 P.2d 842, 845 (Colo.App.1987) (citing *Publix Cab Co. v. Fessler,* 138 Colo. 547, 552–53, 335 P.2d 865, 868 (1959)).

¶ 20 Some jurisdictions have held that ambulance operators are subject to the highest degree of care under a common carrier analysis. *Home Ins. Co. v. Covington,* 255 Ark. 409, 501 S.W.2d 219, 221 (1973); *Nazareth v. Herndon Ambulance Serv., Inc.,* 467 So.2d 1076, 1079–80 (Fla.Dist.Ct.App.1985); *Bricks v. Metro Ambulance Serv., Inc.,* 177 Ga.App. 62, 338 S.E.2d 438, 440–41 (1985); *Heifner v. Sparks,* 392 S.W.2d 1, 3 (Mo.Ct.App.1965). In each of these cases, however, the court relied heavily on the state's statutory definition of a "common carrier," *see, e.g., Covington,* 501 S.W.2d at 221, or, in one case, a state statute requiring that all motorists exercise the highest degree of care, *Heifner,* 392 S.W.2d at 3.

¶ 21 Other jurisdictions have expressly refused to characterize ambulances as common

---

**1.** We note that the use of the highest degree of care instruction should not be used in premises liability cases against amusement park landowners. *See Anderson v. Hyland Hills Park and Recreation District,* 119 P.3d 533, 536 (Colo.App. 2004) (holding that the degree of care described in Colorado's premises liability statute should be used in such cases rather than the common law standard of care for amusement devices). *Anderson* itself has been abrogated on other grounds by *St. Vrain Valley School District RE–1J v. A.R.L.,* 2014 CO 33, ¶ 20 n.10, 325 P.3d 1014 (a single waterslide does not constitute a "swim-

ming facility" under the Colorado Governmental Immunity Act sufficient to waive governmental immunity).

**2.** Because Bedee does not rely on the common law concept of inherently dangerous activities in this appeal and, instead, relies on the test in *Lewis,* we will not analyze whether the ambulance trip here is an inherently dangerous activity that requires a higher standard of care under common law.

carriers necessitating a higher degree of care. *Long v. Illinois Power Co.,* 187 Ill. App.3d 614, 135 Ill.Dec. 142, 543 N.E.2d 525, 534–36 (1989); *Morales v. Employers' Liab. Assurance Corp.,* 7 So.2d 660, 663 (La.Ct. App.1942); *Hollander v. Smith & Smith,* 10 N.J.Super. 82, 76 A.2d 697, 700–01 (App.Div. 1950). In *Long* and *Hollander,* the courts applied a test, supported by state case law, to determine whether an ambulance was acting as a common carrier. *Long,* 135 Ill.Dec. 142, 543 N.E.2d at 535; *Hollander,* 76 A.2d at 700. In *Morales,* the court determined that the plaintiff, who was a family member of the patient being transported, was a guest or gratuitous passenger as to the ambulance operator and, therefore, the ambulance company was not a common carrier as to the plaintiff. The court appeared to leave open the question whether an ambulance is a common carrier when the plaintiff is not a guest. *Morales,* 7 So.2d at 663.

¶ 22 As noted above, no Colorado appellate court has addressed whether ambulance drivers are subject to the highest degree of care in negligence actions. Accordingly, we now turn to that issue under the specific circumstances of this case.

### IV. Analysis

¶ 23 Bedee's tendered instruction read as follows: "An ambulance driver must exercise the highest possible degree of skill, care, caution, diligence and foresight when passengers are present in the ambulance. The failure to do so is negligence." The court rejected Bedee's proffered instruction.

¶ 24 Instead, the trial court instructed the jury with Colorado's pattern instructions for ordinary negligence and the reasonable degree of care:

> Negligence means a failure to do an act which a reasonably careful person would do, or the doing of an act which a reasonably careful person would not do, under the same or similar circumstances to protect [oneself or others] from [injury].
>
> Negligence may also mean assumption of risk. A person assumes the risk of injury or damage if the person voluntarily or unreasonably exposes [himself or herself] to such injury or damage with knowledge

> or appreciation of the danger and risk involved.
>
> Reasonable care is that degree of care which a reasonably careful person would use under the same or similar circumstances.

CJI–Civ. 4th 9:6, 9:8 (1998).

¶ 25 Bedee's primary argument on appeal is that the *Lewis* test determines when a defendant owes a passenger the highest degree of care. However, she also cites cases analyzing whether ambulances are common carriers. Therefore, we analyze both whether the circumstances of this case require an analysis of the *Lewis* test and whether an ambulance is a common carrier in Colorado.

### A. Increased Risk and *Lewis*

¶ 26 As noted above, our supreme court has held that amusement ride operators and ski lift operators may be held to the highest degree of care in a tort action because the passengers have given up their freedom of mobility, entrusting their care and control to the defendant operator; there is nothing passengers can do to prevent the accident; and operators have exclusive care and control of the facility. *Bayer,* 960 P.2d at 73; *see Lewis,* 156 Colo. at 57, 396 P.2d at 939. In the case of ski lift operators, these factors are rooted in the court's observation that ski lifts are operated at a significant height above the ground over rough terrain and are therefore more dangerous and require more responsibility than the activities requiring only an ordinary degree of care. *Bayer,* 960 P.2d at 73. Similarly, the court in *Lewis* noted the following regarding the stage coach ride at issue in that case:

> The roadway was rutted, at places banked on curves so that the outside of the curve was the low side. The horses were driven at a walk, jog, trot or gallop, in order to "give the people having the ride a kind of thrill and excitement." The overall effect, drawing the coach along the road, at the speeds pursued and with the equipment provided, was that the coach would sway "quite a little bit in the motions of the road and the motions of the horses pulling."

*Lewis,* 156 Colo. at 55, 396 P.2d at 938. As demonstrated by these cases, Colorado follows the general rule that reasonable care varies according to the degree of risk associated with the activity in question. *Imperial Distrib. Servs., Inc.,* 741 P.2d at 1254. An elevated degree of risk is a prerequisite for instructing on a higher degree of care. *See Bayer,* 960 P.2d at 73; *Imperial Distrib. Servs., Inc.,* 741 P.2d at 1254.

¶ 27 Here, unlike ski lifts or the amusement ride in *Lewis,* there is no evidence of an increased degree of risk on the return ambulance trip. The neonate was no longer on board, and there was no emergency requiring the use of emergency lights or sirens. According to Bedee's own testimony, the ambulance was traveling at normal speeds as it left Denver, there was no change in speed when the driver was allegedly looking at or using his mobile device, and she was wearing her seatbelt in the back of the ambulance. Moreover, other evidence showed that the ambulance had no sudden or hard decelerations or accelerations, that it never exceeded the speed limit, and that it had low gravitational forces. In sum, under the circumstances here, the ambulance was merely another vehicle traversing the roads. In Colorado, for over half a century, our courts have held that drivers have a duty to drive with reasonable care under the circumstances. *Hesse v. McClintic,* 176 P.3d 759, 762 (Colo.2008). Thus, the circumstances here involved no increased risk that would necessitate a higher degree of care than that of reasonable care.

¶ 28 The alleged negligence in this case was that the driver was looking at some type of handheld device while he was driving, causing his eyes to occasionally leave the road, and that he did not slow down when the ambulance allegedly hit a series of dips. These actions could have been, but were apparently not, considered negligent by the jury, but they had nothing to do with the fact that the vehicle in which Bedee was a passenger was an ambulance.

¶ 29 The specific circumstances of this incident—an ambulance traveling on a return trip to the hospital without a patient and in a nonemergency situation—and the type of

negligence alleged—inattentive driving—are not the type of conduct that, in our view, shows an increased risk such that a *Lewis* inquiry for a higher degree of care would be triggered. Were the *Lewis* test applicable here, virtually every car with passengers could be analyzed under *Lewis* and likely subject drivers to the highest degree of care because the passenger is under the care and control of the driver, the passenger cannot prevent an accident or maintenance issues, and the car is under the exclusive control of the driver. *Bayer,* 960 P.2d at 73. Such a result would call into question over fifty years of precedent affirming that Colorado drivers have a duty to exercise ordinary reasonable care under the circumstances while driving. *Hesse,* 176 P.3d at 762.

¶ 30 While we conclude that the trial court here did not err in its instructions and in rejecting Bedee's tendered instruction, we emphasize that our holding is limited to the factual circumstances of this case. We need not decide whether an ambulance trip can ever be an activity with increased risks that would warrant giving an instruction that an ambulance driver was subject to the highest degree of care. We only conclude that the specific circumstances of the return trip here, where the ambulance was traveling at normal speeds in a nonemergency situation and the passenger was wearing a seat belt, did not constitute the type of activity that has an increased risk of injury to others beyond the ordinary negligence standard of care.

### B. Common Carrier

¶ 31 We also reject Bedee's argument that the ambulance in this case was acting as a common carrier.

¶ 32 As noted above, courts in some jurisdictions have found ambulances to be common carriers and, therefore, hold that the drivers are subject to a higher degree of care under common law. *Covington,* 501 S.W.2d at 221; *Nazareth,* 467 So.2d at 1079–80; *Bricks,* 338 S.E.2d at 440–41. However, these courts have relied on their own state statutes and case law to conclude that ambulances are common carriers. As stated by the court in *Nazareth,* "[i]n some jurisdictions ambulances are deemed to be common

carriers and in others they are not. The differences seem to depend upon the wording of the particular state's statutes." 467 So.2d at 1080 (citation omitted). In that case, the Florida court analyzed its state statutes defining private carriers and common carriers, concluding that the ambulance in that case was more similar to a common carrier, which justified a higher degree of care. *Id.*

¶ 33 Similarly, in *Covington,* on which Bedee relies, the Arkansas Supreme Court upheld the trial court's instruction holding the ambulance operators to the highest degree of care because, given the proof presented to the trial court, it "was justified in concluding that the ambulance company was a common carrier within our statutes and cases." 501 S.W.2d at 221; *accord Bricks,* 338 S.E.2d at 440–41 (making a determination as to common carrier issue based on Georgia statutes and case law defining "common carrier"). Bedee also relies on the *Heifner* case from Missouri, in which the defendant there conceded that the ambulance driver was required to exercise the highest degree of care. 392 S.W.2d at 3–4. That concession was not surprising, however, because of a Missouri statute mandating that all motorists be held to the highest degree of care. Mo. Ann. Stat. § 304.012(1) (West 2015); *Garvey v. Ladd,* 266 S.W. 727, 730 (Mo.Ct.App.1924) (Missouri statutes as early as 1921 require motorists to exercise the highest degree of care).

¶ 34 When other states have concluded that ambulances are not common carriers, they again analyze the ambulance service at issue in light of tests established by existing case law or specific statutory provisions. *See, e.g., Long,* 135 Ill.Dec. 142, 543 N.E.2d at 535; *Morales,* 7 So.2d at 663; *Hollander,* 76 A.2d at 700.

¶ 35 Thus, we turn to Colorado case law and statutes to determine how Colorado defines the term "common carrier." The parties have cited no Colorado appellate case authority, and we have been unable to find any, articulating a test for determining if a transportation vehicle was acting as a common carrier. *Cf. Denver Cleanup Serv., Inc. v. Pub. Utils. Comm'n,* 192 Colo. 537, 539–40, 561 P.2d 1252; 1253 (1977) (noting that stat-

utes provide for both common carriers and contract carriers and that one will look in vain in Colorado's statutes and state court rulings for a clear definition of contract carrier). However, in *Deutsch v. Chubb Group of Insurance Companies,* No. Civ. A. 95–B–331, 1995 WL 584394, at *2 (D.Colo. Sept. 29, 1995) (unpublished opinion), the federal district court in a breach of contract action used the definition of "common carrier" in section 40–1–102, C.R.S.2014, to determine the meaning of common carrier within the contract at issue.

¶ 36 Title 40 of the Colorado Revised Statutes appears to be the only title that contains a definition of the term "common carrier," despite the term's appearance in a number of other titles. For example, section 38–20–105, C.R.S.2014, permits common carriers of goods and passengers to impose a lien upon their clients, but does not define the term "common carrier," nor is that term defined in the definitions section for part 1 of that article, section 38–20–101, C.R.S. 2014. Further, other statutory sections expressly refer to title 40 for a definition of a common carrier. *See, e.g.,* § 8–70–140.5(1), C.R.S. 2014 (noting that the term "employment" does "not include services performed by an individual who is working as a driver under a lease or contract with a taxi or limousine motor common carrier that holds a certificate pursuant to article 10.1 of title 40, C.R.S.").

¶ 37 Title 40 governs utilities, and the definition of "common carrier" is defined within the public utilities section. § 40–1–102(3). Specifically, section 40–1–102(3) provides:

(a) "Common carrier" means:

(I) Every person directly or indirectly affording a means of transportation, or any service or facility in connection therewith, within this state by motor vehicle or other vehicle whatever by indiscriminately accepting and carrying passengers for compensation; and

(II) Every person affording a means of transportation within this state by railroad by indiscriminately accepting and carrying for compensation passengers or property.

(b) *"Common carrier" does not include a motor carrier that provides transportation*

*not subject to regulation pursuant to section 40–10.1–105,* a motor carrier that is subject to part 3, 4, or 5 of article 10.1 of this title, a transportation network company, as defined in section 40–10.1–602(3), or a transportation network company driver, as defined in section 40–10.1–602(4).

(Emphasis added.) In section 40–10.1–105(1)(d), C.R.S.2014, transportation by ambulances is specifically excluded from regulation as a common carrier and, thereby, ambulances are excluded from the definition of a common carrier.

¶ 38 Bedee argues that title 40 is only meant to be a regulatory and licensing statute and does not control the common law standard of care in a tort action. Nevertheless, title 40 provides the only definition for "common carrier" in the Colorado statutes or case law, and other statutory sections and at least one case refer to the utilities title for the definition of common carrier in situations outside of the realm of utilities. § 8–70–140.5(1); *Deutsch,* 1995 WL 584394, at *2. And, at least one other state has relied on the definition of "common carrier" in its utilities statutes to determine whether an ambulance was acting as a common carrier. *Bricks,* 338 S.E.2d at 440–41 (using Georgia Code Annotated section 46–1–1(4), (9) (1985) for definition of common carrier). Bedee does not provide an alternative definition of common carrier, but merely asserts in a conclusory fashion that traveling in the back of an ambulance is no different from traveling in the back of a taxi cab or on a bus. We are not persuaded.

¶ 39 Our primary task is to give effect to the General Assembly's intent by first looking to the statute's plain language. *Wiesner v. Huber,* 228 P.3d 973, 974 (Colo. App.2010); *Francis in Interest of Goodridge v. Dahl,* 107 P.3d 1171, 1176 (Colo.App.2005). " 'Words and phrases should be given effect according to their plain and ordinary mean-

ing and, unless it would lead to an absurd result, a court must not strain to give statutory language anything other than its plain meaning.' " *Wiesner,* 228 P.3d at 974–75 (quoting *Barnes v. Colo. Dep't of Revenue,* 23 P.3d 1235, 1236 (Colo.App.2000)). We give effect to each word and construe each provision in harmony with the overall statutory design whenever possible. *Telluride Resort & Spa, L.P. v. Colo. Dep't of Revenue,* 40 P.3d 1260, 1265 (Colo.2002). We "respect the legislature's choice of language," *Turbyne v. People,* 151 P.3d 563, 568 (Colo.2007), and "do not add words to the statute or subtract words from it," *id.* at 567.

¶ 40 The General Assembly has made it explicit that ambulances are not included in the definition of common carriers. §§ 40–1–102(3), 40–10.1–105(10)(d). The language is clear and unambiguous, and we must adhere to that language if it does not lead to an absurd result. *Wiesner,* 228 P.3d at 974–75. Relying on the plain language of the statutes in this instance does not lead to an absurd result, especially where, as here, the General Assembly created this exception in 2011, after Colorado adopted the common law doctrine that common carriers are subject to a higher degree of care in negligence actions. Ch. 127, sec. 1, § 40–10.1–105, 2011 Colo. Sess. Laws 398 (adopting the ambulance exception); *Publix Cab Co.,* 138 Colo. at 552–53, 335 P.2d at 868 (adopting the common law common carrier doctrine).

¶ 41 Bedee asks us to ignore the definition of common carrier in the public utilities statute that excepts ambulances and, essentially, make a judicially created exception to the exception. She argues that ambulances should not be considered common carriers for regulatory purposes, but should be considered common carriers in tort cases, because ambulances are a commercial transportation service.[3] We decline to recognize such

---

3. Indeed, although not argued by the parties, it is not clear in this case that the ambulance would be a "common carrier" as opposed to a "contract carrier." Colorado law distinguishes between "common carriers" and "contract carriers" in that a common carrier must convey all persons desiring transportation, while a contract carrier has an obligation only to its contract

customers. *Deutsch v. Chubb Grp. of Ins. Cos.,* No. Civ. A. 95–B–331, 1995 WL 584394, at *2 (D.Colo. Sept. 29, 1995) (citing *Denver Cleanup Serv., Inc. v. Pub. Utils. Comm'n,* 192 Colo. 537, 540, 561 P.2d 1252, 1253 (1977)). Under a recently enacted statute, a contract carrier is defined as "every person, other than a common carrier or a motor carrier of passengers under

an exception, because to do so would ignore the plain language of title 40 and both add and remove language from that title. We cannot do either. *Turbyne*, 151 P.3d at 567; *Wiesner*, 228 P.3d at 974–75.

### V. Conclusion

¶ 42 We conclude the ambulance operators in this case were not subject to the highest degree of care, and, therefore, the trial court did not err in rejecting Bedee's highest degree of care instruction. Accordingly, the judgment is affirmed.

Rothenberg * and Roy *, JJ., concur

part 3 of this article, who, by *special contract,* directly or indirectly affords a means of passenger transportation over any public highway of this state." § 40–10.1–101(6), C.R.S. 2014 (emphasis added). Here, the ambulance was specifically instructed to transport a neonate from one hospital to another and then return to its home base—it was not free to pick up any passenger who wanted to be transported to a hospital.

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24–51–1105, C.R.S. 2014.