(No. 78-CC-0952— ▮▮▮▮▮▮▮▮

DONALD H. BAUMAN, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed May 7, 1981.*

CALDWELL, BERNER & CALDWELL (MICHAEL T. CALDWELL, of counsel), for Claimant.

WILLIAM J. SCOTT, Attorney General (JOHN R. FANONE, Assistant Attorney General, of counsel), for Respondent.

Roe, C. J.

This is an action against the State of Illinois for money damages on a claim sounding in tort brought by Claimant, Donald Bauman, for personal injuries he received in an automobile accident that occurred on April 11, 1977, on Illinois Route 47 near the intersection of Wanda Lane in Woodstock, Illinois, when the vehicle the Claimant was driving was struck by a motor vehicle being operated by Illinois State Police Officer Thomas P. Burke. The Court of Claims has jurisdiction of this cause pursuant to section 8 (d) of "An Act to create the Court of Claims to Prescribe its Powers and Duties . . . (etc.)." Ill. Rev. Stat., ch. 37, par. 439.8 (d).

At the time of the occurrence Claimant was travelling south on Route 47 near its intersection with Route 14. He intended to make a left hand turn onto a street known as Wanda Lane lying northerly of Route 14. Illinois 47 is a two lane highway running in a generally north-south direction which widens into four lanes in the vicinity of its intersection with Wanda Lane. As he approached Wanda Lane the southbound traffic ahead of him was stopped. He was travelling in the inner southbound lane, and as he approached Wanda Lane, he turned on his left turn signal, slowed down almost to a stop, and made the turn.

Illinois Trooper Thomas P. Burke, on duty and operating a State Police squad car, had received a call concerning an accident on Route 14 east of Route 47. Proceeding southbound on Route 47, when he reached the area of Wanda Lane he noticed twenty to twenty-five cars stopped in front of him at the red lights at Route 14. He pulled out into the inner northbound lane and reached Wanda Lane at the same time that Claimant was

attempting to turn left into it. Claimant turned left in front of him when he was approximately 25 feet from Claimant's car. He struck Claimant's car in the center of the driver's side and knocked it 300 feet into a field. Claimant was severely injured. The accident occurred around 2:00 o'clock in the afternoon.

"Page 72. The highway is four-lanes as you approach the intersection of Route 47 and Wanda Lane.

Page 73. I was travelling in the inside southbound lane of traffic on the east side of the road. That is the traffic lane that is closest to the center of the highway. The southbound traffic immediately ahead of me was stopped as I approached the intersection of Route 47 and Wanda Lane.

Page 74. As I approached the stopped traffic I was making a left turn. I was intent on making a left turn. I turned on my left turn signal.

Page 76. I was approximately 200 feet from Wanda Lane when I turned the signal on. I was driving very slow. There was traffic travelling in the same direction immediately behind me. I do not know how many cars there were. I had my turn signals on when I got to the intersection of Wanda Lane and Route 47.

Page 77. I proceeded to make a left hand turn as a car was coming by on the outside northbound lane. As it passed, I proceeded to turn into Wanda Lane.

I don't really remember if I came to a complete stop or not, before attempting to negotiate the left-hand turn. I was going very slow when I made the turn."

Portions of Trooper Burke's abstracted occurrence testimony are quoted below:

"Page 30. On April 11, 1977, I was involved in an accident at about 2:00 in the afternoon.

Page 33. I was operating a State Police squad car on that date. I was proceeding to another accident at the time. The other accident was on Route 14 East of Route 47 approximately a mile.

Page 34. I was around Route 120 and Wonder Lake Road when I received the call. It is in the neighborhood of ten miles from the scene. It probably took about eight or nine minutes from the spot where I received the call to the place where the accident occurred.

Page 35. As I got onto Route 47, I passed about two cars going southbound.

Page 37. I was in the right hand lane. I pulled out just prior to the accident to pass the farther traffic. I was going about 45 miles per hour. There were in the neighborhood of 20 cars stopped in front of me at the red lights on Route 14, 20, or 25 maybe. I was just a few hundred feet to the north, from the intersection of Route 47 and 14 when I pulled out.

Page 38. I believe I was south of the viaduct when I pulled out . . . I was in lane number two, or I was in the inner lane of the northbound traffic at the point of collision. I was proceeding southbound. The car I came into contact with when I pulled out was stopped in front of me to the best of my knowledge.

Page 39. He was either the third or fourth car. I had passed either two or three. There was no northbound traffic approaching as I pulled out. Both lanes of northbound traffic were vacant. I saw the other car just a split second, as it pulled out left in front of me. When I first saw it it was stopped in the lane of traffic.

Page 40. I saw the car suddenly pull left in front of me. I slammed on my brakes. I couldn't do anything else. I knew there was going to be a collision. About one second elapsed between the time I first saw the car pull out turning left and time the collision occurred.

The right front of my car hit the driver's side, right behind the pillar of the other car, right in the center of the car, the left hand side.

Page 50. It appeared to me, that the car was stopped and just pulled out of traffic making a left turn in front of me. I thought he was going to make a U-turn because he didn't want to wait for all the cars stopped ahead of him. It was the only thing I could think of at the time. I remember thinking he was going to make a U-turn there.

I never saw the driver of the vehicle."

## I. Was Respondent guilty of any actionable wrong?

At the outset it should be noted that to determine Respondent's liability, if any, for Trooper Burke's conduct in driving his emergency vehicle, the Trooper's conduct is to be measured against a specific statutory standard:

"11—205. Public officers and employees to obey Act—Exceptions.

(a) ° ° °

(b) The driver of an authorized emergency vehicle, when responding to an emergency call or when in the pursuit of an actual or suspected violator of the law or when responding to but not returning from a fire alarm, may exercise the privileges set forth in this Section, but subject to the conditions herein stated.

(c) The driver of an authorized emergency vehicle may:

1. ° ° °

2. ° ° °

3. ° ° °

4. Disregard regulations governing direction of movement or turning in specified directions.

(d) The exceptions herein granted to an authorized emergency vehicle, *other than a police vehicle,* shall apply only when the vehicle is making use of either an audible signal when in motion *or* visual signals meeting the requirements of Section 12—215 of the Act. (Emphasis supplied).

(e) The foregoing provisions do not relieve the driver of an authorized emergency vehicle from the duty of driving with due regard for the safety of all persons, nor do such provisions protect the driver from the consequences of his reckless disregard for the safety of others.

(f) ° ° ° ” (Ill. Rev. Stat., chap. 95½, par. 11—205.)

Section 11—907 of the same chapter, outlining the duties of drivers on the approach of authorized emergency vehicles is as follows:

“11—907. Operation of vehicles and streetcars on approach of authorized emergency vehicles. (a) Upon the immediate approach of an authorized emergency vehicle making use of audible *and* visual signals meeting the requirements of this Chapter *or a police vehicle properly and lawfully making use of an audible or visual signal,* the driver of every other vehicle on the same roadway shall yield the right-of-way and shall immediately drive to a position parallel to, and as close as possible to, the righthand edge or curb of the highway clear of any intersection and shall stop if possible and remain in such position until the authorized emergency vehicle has passed, except when otherwise directed by a police officer. (Emphasis supplied).

(b) ° ° °

(c) This Section shall not operate to relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons using the highway.” (Ill. Rev. Stat., chap. 95½, par. 11—907.)

The above two sections appear to distinguish between the use of an audible signal by a police vehicle and by other types of emergency vehicles.

Fortunately, paragraph 12—601, not cited by either Claimant or Respondent, defines more clearly when a siren shall be used:

“12—601. Horns and warning devices.

(a) ° ° °

(b) No vehicle shall be equipped with nor shall any person use upon a vehicle any siren, whistle, or bell, except as otherwise permitted in this subsection. Any authorized emergency vehicle as defined in Chapter 1 of this Act may be equipped with a siren, whistle, or bell, capable of emitting sound audible under normal conditions from a distance of not less than 500 feet, but such siren, whistle or bell, shall not be used except when such vehicle is operated in response to an emergency call or in immediate pursuit of an actual or suspected violator of the law in either of which events *the driver of such*

*vehicle shall sound such siren, whistle, or bell, when necessary to warn pedestrians and other drivers of the approach thereof."* (Emphasis supplied.) (Ill. Rev. Stat., chap. 95½, par. 12—601.)

From reading all three statutory sections together we learn that a police officer in responding to an emergency call must use his siren *"when necessary to warn pedestrians and other drivers"* of his approach, and that in every event he must drive *"with due regard for the safety of others."* Finally, the provisions of chapter 95½ will not protect him *"from the consequences of his reckless disregard for the safety of others."*

In order to determine the issue of whether Respondent was guilty of any actionable wrong in this occurrence, two key questions of fact must be answered.

(1) Was Trooper Burke using his siren at the time of the collision and immediately before? If not,

(2) Should he have been using his siren?

It is uncontested that as Officer Burke undertook to pass on the wrong side of the road the line of twenty to twenty-five stopped southbound cars his flashing red lights were operating. It is contested as to whether he was using his siren. In the opinion of the Court the weight of the evidence is that he was not using it, or at least was not using it sufficiently so as to perform its function of warning other drivers of his approach.

Trooper Burke testified that he was south of the viaduct when he pulled out just a few hundred feet north of the intersection of Routes 47 and 14. The shortness of the distance can be seen by examining Claimant's Exhibit No. 3 taken at the intersection of Routes 47 and 14 looking northwards to the viaduct. Prior to reaching the viaduct he had passed two cars, one of which pulled off to the side of the road. At a pretrial discovery deposition he testified that he turned his siren on at Route 120 and

Wonderlake Road and kept it on all the way until the accident. But at the hearing of the case he testified that he was using his siren intermittently.

The driver of the car that pulled off the road when Trooper Burke passed it was one Mrs. Laura Martell. She testified as follows:

"Page 9. The police car, when I first saw it, was coming up behind me. I glanced up in the rearview mirror. He was directly behind me coming up fast, and he was going to go around me. He has his red lights on, but no siren.

He started to come past me. I pulled off the road . . . .

Page 10. I pulled off so he wouldn't have to swing around me so far, and he was in the left hand lane at that point. I was more or less watching him as I got back on the road. The police car was in the left lane and its lights were still working.

Page 11. As long as I saw it, I never heard a siren. There was no siren operating. Then I came upon the scene of the accident ° ° °"

## On cross-examination she testified:

"Q. Do you know for sure there wasn't a siren or you just didn't hear one?

A. There was not a siren.

Q. You didn't hear one?

A. No, I would have heard it."

Another witness, one William H. Schwake, in a car stopped at the intersection, testified as follows:

"Page 22. On April 11, 1977, I was near Wanda Lane by the viaduct.

Page 24. As we approached the intersection of Route 14, the traffic was heavy. The intersection is controlled by traffic control signals. We had to stop first because of a red light. We stopped through that red light and through a green light because of the rescue squad going through at that time.

Page 25. The rescue squad was going south on Route 14. I don't recall if there were other squad cars or not. I couldn't tell if the rescue squad had its lights on. I heard the siren, but I couldn't tell if it was the rescue squad or what. I assumed it was. I heard a crash behind us. I heard nothing else before the crash.

Page 26. The crash came from behind us. The first car we saw was a car going by us erratically and it ended up in a ditch. The next one was a state trooper's car and it ended up in the ditch almost right along side us."

## Claimant testified as follows:

"Q. As you approached the intersection of Wanda Lane and Route 47 did you hear any sirens?

A. No sir, I did not.

Q. Specifically, did you hear any sirens coming from the north going south behind you?

A. No, sir."

To summarize the testimony of the three witnesses: Mrs. Martell testified positively that Trooper Burke was not using his siren. Witness Schwake testified that he assumed the siren he heard was coming from the emergency vehicle on Route 14. Claimant did not hear a siren.

If Trooper Burke was using his siren at all, he was not using it in such a fashion as to satisfy the statutory injunction to warn other vehicles of his approach. Mrs. Martell was aware of his approach only because she saw him in her rear view mirror. Witness Schwake was not aware of his approach until he hurtled past after the collision and ended up in a ditch. Claimant was not aware of his approach at all.

Considering the fact that the officer was passing 20 to 25 vehicles, on the wrong side of the road, in the immediate vicinity of an intersection into which three driveways and Wanda Lane opened and while travelling 45 miles per hour, it was mandatory that he use his siren steadily.

It is clear that Officer Burke should have foreseen that use of his siren, or more use of his siren than he made, was necessary to warn motorists of his approach.

In *Kirshenbaum v. City of Chicago*, 43 Ill. App. 3d 529, 357 N.E.2d 571 (involving an intersection collision and therefore not strictly in point on the facts), the Court held that a police officer's failure to sound his siren was, under the circumstances of the case, willful and wanton negligence. Also see *Sundin v. Hughes*, 107 Ill. App. 2d 195, 246 N.E.2d 100 (a case only involving pleadings).

Both sides have argued as to whether Claimant was

guilty of contributory neligence. Contributory negligence would not be a defense if Trooper Burke were found to be guilty of willful and wanton negligence. Then only contributory willful and wanton negligence would be a defense. Clearly, Claimant was not guilty of contributory willful and wanton negligence. A fair reading of the record is that he was not guilty of ordinary contributory negligence but the question is not altogether free from doubt.

Claimant testified that he looked in both rear view mirrors and did not see Trooper Burke approaching. The cars in back of him would have obscured his view through his inside rear view mirror, and with reference to his outside rear view mirrors, it is known that all rear view mirrors have blind spots. In other words, if Trooper Burke had been further to the rear when Claimant looked, he probably would have seen him in his outside rear view mirror, but a car that is almost abreast of you is frequently not picked up in the mirror. As Trooper Burke testified, "I was only about 25 feet in back of him when I saw him start to pull out to the left and to the rear. I locked up my brakes when I saw him pull out." Also, Claimant would have had no reason to expect that a car would be approaching from the rear on the wrong side of the road.

II. Were the actions of Respondent the proximate cause of the accident?

In line with the foregoing analysis the failure of Trooper Burke to use his siren, or use it sufficiently to warn other motorists of his approach, was the proximate cause of the collision and of Claimant's damages.

III. Measure of damages.

Claimant received severe and painful temporary injuries, but except for damage to nine teeth, no per-

manent injuries. His specials were all paid for by insurance. Under the authority of *National Bank of Bloomington v. State of Illinois*, No. 73-CC-0467, filed July 28, 1980, there can be no recovery for these specials.

Claimant summarized his injuries in his brief as follows:

"That Donald Bauman was seriously and severely injured is obvious. He suffered several fractured ribs, dangerous internal bleeding and was almost totally disabled for the better part of three months. He experienced constant severe pain and has never fully recovered the vitality he had before the accident."

Considering the injuries to his mouth also, it is hereby ordered that Claimant be, and hereby is, awarded the sum of $35,000.00.