(No. 91-CC-3580— ▮▮▮▮)

IRENE S. ANSON, Claimant, *v.* THE STATE OF ILLINOIS,
Respondent.

*Order filed January 13, 1998.*

SANDMAN, LEVY & PETRICH (NANCY A. THRILL, of counsel), for Claimant.

JIM RYAN, Attorney General (JONATHAN C. GREEN, Assistant Attorney General, of counsel), for Respondent.

## ORDER

MITCHELL, J.

This cause comes before the Court on the complaint at law of Claimant, Irene S. Anson, against Respondent, State of Illinois, seeking compensation for injuries sustained in a motor vehicle accident that occurred on June 21, 1990. Claimant alleged that an agent and servant of Respondent negligently operated a motor vehicle owned by Respondent on the day in question. Claimant asserted that she was driving her motor vehicle in a southerly direction on Cicero Avenue, Chicago, Illinois, and Respondent's

negligence was the proximate cause of a collision between the two vehicles, causing her injuries. The complaint requested $50,000 for pain and suffering and $12,573.54 as compensation for specifically itemized damages listed in her bill of particulars.

A hearing was conducted on December 20, 1996, at which the following three witnesses were presented: Irene S. Anson; Frank Anson, Claimant's husband; and Mark Ashbrook, an Illinois State trooper. Claimant's exhibit nos. 1 through 15, 15(A)-(K) and 17 were admitted into the record. Claimant's exhibit no. 16 was ruled to be inadmissible. Respondent's exhibit nos. 3 and 5 through 8 were admitted. Respondent's exhibit no. 1, the departmental report, was admitted with the exception of an affidavit. Respondent's exhibit no. 2 was ruled inadmissible. There was no Respondent's exhibit no. 4.

Claimant, Irene S. Anson, testified that on June 21, 1990, she was traveling south on Cicero Avenue, enroute from work, a route she had taken many times over the last 15 to 18 years. She was involved in an accident near the intersection of Cicero and Peterson Avenue (an east-west street). At the intersection, Cicero has three southbound lanes, a curb lane, a center lane and a left turn lane. When she first turned onto Cicero she was traveling in the left lane, next to the center line. She then moved into the curb lane. Her speed did not exceed 20 miles per hour. It was a beautiful day and the streets were dry. She then moved her car into a "lane" to the right. The lane, "is where cars are parked" and this lane opens up and widens for a half block immediately preceding Peterson. It is wide enough for a vehicle. Where the lane widens there is a car wash, then a motel, an alley and a service station. This lane is not marked by any lines. Claimant characterized the location as being similar to four lanes

southbound on Cicero. The intersection is controlled by traffic lights. When she first saw the light, it was red. When she first got into the far right "lane" (referred to as "right turn lane" by Claimant without objection), there were vehicles in front of her in that lane. When she entered the right turn lane, there were vehicles stopped in front of her in the left and curb lanes. She was proceeding in the right turn lane at approximately ten miles per hour and intended to turn right onto Peterson. While proceeding in the right turn lane, she "noticed from the side of [her] left side that there was a vehicle just a couple inches away from [her] car and [she] got hit and knocked into a pole." She later learned that the vehicle was a State police car. About two seconds elapsed between her first noticing the vehicle and the impact. She did not hear anything, such as horns, screeching brakes or sirens, and the vehicle did not have its mars lights on.

Claimant's vehicle was hit on the left driver's side and rear by the front of the State trooper's vehicle. The front of her vehicle struck a pole near a gas station. She felt a bit of pain in her chest. Both impacts were heavy. She was wearing her seat belt. Her arms were sore, she could not speak and the whole three quarters of her right breast was bruised. The ambulance transported her to Swedish Covenant Hospital.

Claimant identified 11 photographs as accurately depicting the condition of her vehicle after the accident. She believed exhibit no. 15(I) best depicts the area where the first impact occurred with the trooper's vehicle and exhibit no. 15(E) best depicts the area where the second impact occurred.

While in the emergency room at Swedish Covenant Hospital, Claimant complained about her chest, neck, arms and back. She stayed in the hospital for three days.

She felt like a tractor had rolled over her and she could not lie flat. She had pain in her neck, back, arms and breastbone. The pain medication helped alleviate some of the pain.

After being discharged from the hospital, Claimant still experienced soreness and stayed home from work, off her feet, for five and a half weeks. She was not able to attend to her regular duties and functions. The bruise on her chest stayed for about two months. She saw her doctor, Dr. John Caserta, at Holy Cross Hospital. She saw him on a regular basis. She experienced pain in her chest for five or six weeks. She is still taking pain medication for her neck. When the weather changes, three or four times a year, she feels pain in her chest. She continues to see Dr. Caserta. When she turns her head it feels like there is "gravel or crystals" in her neck. She cannot tilt her head back and when she turns it to either side she feels pain. Her arms are "terrible, especially during the night."

Prior to the accident, she had not injured her neck and not experienced pain or problems in her arms. She cannot cut the lawn, carry heavy grocery bags or mop the floor like she did before the accident. She cannot put pressure on her arms to get out of the bathtub and has trouble hanging laundry because of the pain in her arms. She slept on a love seat for a year and a half because she had to sleep in a confined space due to the pain in her arms. She could not even be a wife to her husband. She is an accounts payable clerk and she cannot move boxes, files or big piles of checks with lots of invoices. She cannot romp with her grandchildren or stand for more than 15 minutes before experiencing pain in her shoulders and neck. She experiences pain, at different times and in different degrees, in her arms and neck. She takes Darvocet two or three times a day based upon a prescription from

Dr. Kalinga. She tried going without pain medication for a week or two but the pain was really bad.

At the time of the accident she was earning $375 a week, and at times earned overtime. She estimated overtime to be an average of $25 to $35 per week. She had a cleaning service and earned $350 per month cleaning the office twice a week. She could not continue cleaning. She hired a friend to do the cleaning and paid her $180 a month.

Claimant offered into evidence medical bills identified as Claimant's exhibit nos. 3 through 14. Respondent did not object to any medical bills for services rendered prior to December 31, 1990. However, all bills for services rendered after December 31, 1990, were objected to because they were not included in the complaint and Respondent did not have notice. The following documents, or portions thereof, were admitted without objection: Claimant's exhibit no. 3; the portion of Claimant's exhibit no. 4 prior to December 31, 1990; and Claimant's exhibit nos. 5 through 10. Respondent objected to Claimant's exhibit nos. 11 through 14 and the portion of Claimant's exhibit no. 4 for services subsequent to December 31, 1990. All of the exhibits were admitted into the record.

On cross-examination, Claimant acknowledged that she was looking at the traffic light as she was going down the curb lane. When she entered the right turn lane she saw three or four cars stopped in the lanes to her left. She agreed that the impact with the trooper's vehicle started at her front left fender, then proceeded to her door and then to the left rear fender. Claimant was treated for carpal tunnel syndrome in 1989. She was taken to the hospital after an accident in May of 1995, and later visited Dr. Caserta. In December, 1994, and July, 1995, she experienced slipped discs in the bottom of her back and visited Dr. Kalinga.

On redirect examination, Claimant stated that her vehicle was completely within the right turn lane and she had traveled two or three car lengths before the impact. In 1989, her hand to her elbow bothered her and she had surgery to release pressure on a nerve. She had no pain or problems after her hand surgery. The pain she described in her arms after the subject accident was different from the problem she had in 1989. After the accident in 1995, she was checked at the emergency room and was released. She did not experience any pain. In relation to her slipped disc in July, 1994, she experienced pain in her lower back, and from her right knee up to her hip.

Claimant's husband, Frank Anson, testified that he was not a witness to the accident. When he arrived at the hospital, he observed that his wife was pale, white and had been crying. Prior to June, 1990, his wife never had problems with day-to-day functions. Since June 21, 1990, she complains about her neck and back pain constantly. She cannot hang his flannel shirts and he has to help her out of the bathtub. She walks slower. In the 18 months after the accident she was not a wife to him.

Mark Ashbrook testified that he was an Illinois State trooper on June 21, 1990, and had been for five years. On the day in question, he was on patrol with a probationary trooper. The probationary trooper's name was Chong S. Lim, and he did not go by the name "Nimson," or any different last name. Ashbrook did not remember whether Trooper Lim testified at a subsequent traffic Court proceeding conducted as a result of the accident. Ashbrook only heard this trooper referred to as "C. S. Lim."

The accident happened at 5:07 p.m. He was assisting a disabled vehicle. An emergency response vehicle (ERV) was also present. His intention was to assist the disabled vehicle, experiencing mechanical problems to the engine,

from the Edens Expressway to the Amoco station on Cicero and Peterson.

Ashbrook followed the disabled vehicle south on the roadway shoulder immediately right of the travel lanes of the Edens Expressway. The vehicle exited on the ramp to proceed eastbound on Peterson. They proceeded east on Peterson and made a left turn (or north) on Cicero. Ashbrook followed the disabled vehicle to the corner of Cicero and Peterson. After the vehicle turned north on Cicero, he went to the right of the vehicle and went north on Cicero. It was his intention to assist the disabled vehicle in making a left turn off Cicero into the gas station. He was going to cross the southbound lanes of traffic at Cicero. He pulled north beyond the southbound left turn lane of Cicero and blocked the southbound center and curb lanes. He could not entirely block the extended right turn lane. He believes the disabled vehicle was in the process of entering the gas station at the time of impact. He does not know whether it had already crossed Claimant's lane at the time of impact. He was stopped blocking traffic approximately three minutes.

Ashbrook agreed that the front end of his vehicle struck the left side of Claimant's vehicle, and the front end of her vehicle struck the pole. He denied that his car was moving, and that he did not have sirens or mars lights on at the time of the impact. He did not see Claimant's vehicle before the impact. At the time he blocked traffic, his partner stayed in the vehicle.

On cross-examination, Ashbrook stated that his partner stayed in the vehicle because it was not reasonable to exit the vehicle due to traffic conditions. On redirect examination, Ashbrook stated that it was reasonable to block the lanes of traffic during rush hour.

The evidence deposition of Dr. John Caserta was admitted into the record (Claimant's exhibit no. 15). The medical records from Dr. Caserta and Swedish Covenant Hospital were admitted (Claimant's exhibit nos. 1 and 2, respectively). Respondent objected to those portions of Dr. Caserta's records subsequent to December 31, 1990.

Dr. Caserta testified that he is a general practitioner and that Claimant has been one of his patients. He examined Claimant a few days after her accident and noted that she had multiple contusions, a strain of the neck muscles and an injury to her sternum. The symptoms were rather acute and Claimant complained bitterly of pain in the chest, sternum and neck, which affected her hands. He gave her a prescription for Tylenol 3 for pain control. He saw her once a month through November, 1990, except for seeing her twice in September.

The x-rays indicated that she had a fracture of the eighth rib on the right side. He saw her about once a month during 1991. The symptoms and signs of neck pain radiating over her shoulder and weakness in her hands were present every time he saw her. He ordered an electromyelogram in 1991 to determine whether there was nerve damage. He referred her to a neurologist and determined there was nerve irritation involving the arms. An MRI was performed and it showed that there were degenerative changes of the cervical spine at C-5, C-6 and C-7, and spinal stenosis. Stenosis is a constricture of the nerve sheath which causes pressure on the individual nerves. The condition is caused by some kind of trauma. He opined that Claimant's stenosis condition, shown in the MRI report dated October 29, 1991, was caused by the automobile accident of June 21, 1990. The MRI also showed herniated disks at C-4, C-5, C-6 and C-7. He opined that the herniated disks were caused by the same automobile accident.

Claimant continued to see him about once a month during 1992 and 1993. He recalled seeing her during 1994, 1995 and 1996, at which times she continued complaining about her neck and arms. She had an MRI taken in October, 1996, and the findings were consistent with the MRI findings in August, 1991. She still had herniated disks in her neck. Her symptoms will continue, and the only thing that can be done is to control the pain. He opined that her condition is permanent. He opined that all of the injuries he previously described were caused by the automobile accident in question.

On cross-examination, Dr. Caserta acknowledged that he treated Claimant for carpal tunnel syndrome for her arm and wrist, and that some of the arm and wrist pain could have been caused by her problems of carpal tunnel syndrome.

Claimant was not willing to wear a collar or follow-up on therapy, which may have possibly increased her pain and suffering. The degeneration of the spine could be caused by arthritis and aging.

Claimant offered into evidence the transcript of the purported testimony of Trooper Lim, Ashbrook's partner, made at a traffic Court hearing. Trooper Lim was deceased at the time of the hearing of the case at bar. Respondent objected. The transcript identifies the witness as "C. S. Nimson." Respondent argued that Ashbrook testified that Lim did not use that name, the entire transcript was not produced and the hearing was for a limited purpose. Respondent waived the need to file a certified copy.

The Court ruled that *Deere v. Chicago Transit Authority* (1948), 72 Ill. App. 3d 729, the case cited by Claimant, would allow the admission into the record of the testimony of a witness that was unavailable. However,

it was ruled that the transcript identifies the witness as "C. S. Nimson," and there was no evidence presented that would demonstrate that C. S. Nimson and C. S. Lim are the same individual and, in fact, there was evidence to the contrary. Claimant believes the name to be a typographical error because the purported testimony shows that it was Ashbrook's partner that testified (Claimant's exhibit no. 16). Claimant's exhibit no. 16 was not admitted. Claimant made an offer of proof that the witness testified that Trooper Ashbrook's vehicle was stopped for only 30 seconds and that the disabled vehicle was already in the gas station before the impact occurred.

Prior to the presentation of Respondent's case in chief, Respondent made an oral motion for directed verdict, which the assistant attorney general indicated would be briefed. The Respondent did not subsequently file a written motion, did not reassert the motion in its brief, nor present any argument in support of the motion. The Court denied the motion. The evidence in this matter construed in a light most favorable to Claimant supports the denial.

Respondent moved for the admission of the departmental report (Respondent's exhibit no. 1), a document that is estimated to be several hundred pages, without pagination or any other organizational scheme. Claimant objected to the police report and to the affidavit of Thomas Beasley, labeled "Voluntary Statement," as hearsay and not admissible pursuant to section 790.140 of the Court of Claims Regulations. (74 Ill. Adm. Code 790.140.) Claimant objected based on relevancy and beyond the scope of section 790.140, to the document entitled notice of motion, with numerous attachments in relation to case no. 92-L-7025 in the circuit court of Cook County.

It was ruled that:

"a. The police report was prepared by Illinois State Police Officer(s) and is therefore within the meaning of Section 790.140 and is admissible.

b. Thomas F. Beasley is not an employee or officer of the State and the portions of his affidavit prepared by a State Police Officer are admissible, but the handwritten statement by Mr. Beasley within the affidavit is not admissible pursuant to Section 790.140.

c. The documents produced in relation to the Circuit Court case, including those prepared by the Attorney General, the Circuit Court and the Appellate Court are admissible pursuant to Section 790.140."

Trooper Mark Ashbrook thoroughly reviewed his 10½ years of training and experience with the Illinois State Police and the awards and commendations he received. The policies and procedures for assisting disabled vehicles is to identify hazards that may be present on the roadway and take necessary steps to alleviate hazards that may be present, including blocking traffic. The guidelines used for blocking traffic are to place the squad car in the way of danger, using the vehicle as a barricade between the danger and the vehicle or persons the officer is attempting to protect. The officer uses his discretion as to how to place the vehicle. He is familiar with the intersection of Cicero and Peterson.

On June 21, 1990, Trooper Lim and he were southbound on the Edens Expressway north of Peterson. He observed a vehicle occupied by two elderly subjects on the right-hand shoulder. They stopped and talked to the individuals and assessed that the individuals had developed a mechanical problem, possibly an overheat. He called for an emergency patrol unit to provide assistance with regard to the vehicle to see if mechanical repairs could be made. It was determined that aid could not be rendered and it was his and Trooper Lim's decision with regard to the traffic conditions and the volume of traffic on the roadway and the incumbent time of day and the age of the subjects, that the clearest and safest thing to do

was to escort them off of the highway to the nearest safe location for possible repair of the vehicle or to have other arrangements made.

He instructed the driver of the disabled vehicle to proceed down the shoulder and he would remain behind the vehicle while the emergency patrol unit would stay in front of the vehicle. The car was cutting out, the power was intermittent and the vehicle had difficulties reaching 20 miles per hour. He had his lights and siren on. They exited I-94 expressway at Peterson. There are no safe shoulders on Peterson or on the expressway, and they intended to escort the disabled vehicle to the gas station at the northwest corner of the Cicero and Peterson intersection.

Respondent produced a diagram purportedly of the intersection (Respondent's exhibit no. 2), and Claimant objected to its admission. Trooper Ashbrook could not attest to the accuracy of the diagram. It was ruled inadmissible because it included depictions of vehicle locations that were not included on the diagram in Respondent's exhibit no. 1, after which it was purportedly modeled.

When they were proceeding east on Peterson, they did not turn into the Amoco station on the left (north) because there was a raised curb median between the east and west bound lanes of Peterson. When the disabled car turned left onto Cicero, it came to a halt and Ashbrook went around and in front of it. There are two driveways into the Amoco station. He had instructed the driver of the disabled vehicle to enter the first driveway (closest to the intersection) after Ashbrook had stopped all oncoming traffic. Ashbrook attempted to stop the traffic north of the second driveway. There was approximately 90 feet between Ashbrook's vehicle and the disabled vehicle. Ashbrook's vehicle was approximately 111 feet from the edge of the intersection.

At the time he began stopping traffic, his emergency lighting and siren were already activated and he was using the left spotlight in a turning motion back and forth to alert, and get the attention of, oncoming traffic. He was in a Chevrolet Caprice squad car with six-inch wide 3M reflectorized type markings, amber in color, and bordered by reflectorized brown and white stripes that run the length of the vehicle side. The squad car had the wig-wag headlights that flash intermittently. It was equipped with red and blue internal grill lights. It had a rotating flashing blue light mounted to the right of the rear view mirror in the front windshield. It had two rear deck lamps mounted and suspended from the rear header facing the back glass, one red and one blue. It had four-way hazard flashers. No mars lights were mounted on top. It is a "semi-marked" unit.

He explained the method used to stop the traffic as follows:

"Q. Now, as you were stopping traffic, could you describe the method that you used in stopping the traffic near that second driveway?

A. Yes, sir. As I came to stop ahead of the disabled vehicle traveling in the northbound lanes, in the center line closest to the center median, I utilized the spotlight to alert attention along with the other use of the lighting and the sirens of the driver in the lane that was southbound nearest to the center coming toward me.

Once I had gotten his attention visually eye to eye with him and alerted him I was going to move into his lane with an actual physical hand sign to stop, I am coming over, I moved the vehicle one way over. I continued to utilize the spotlight and the other emergency equipment and get the attention visually on eye contact with the driver in the lane which would be to the right of the first driver to ensure that he comes to a complete stop also and then bring the vehicle into his lane of travel maintaining angularity of the vehicle to provide the optimum visibility for myself, of the impending hazard coming toward me, but also to allow me the opportunity to see the disabled vehicle and clear him into the drive to clear him from the roadway.

Q. Now, as you proceeded in that fashion to the right end of the roadway, did you have to block the left-hand turn lane?

A. The rear of my squad, the position and the configuration of the roadway with regard to the left-hand turn lane was just to the rear of my squad. It was not actually protruding into that lane of travel.

There was a vehicle who had also come to stop that would have contin-
ued on to make a left-hand turn but that driver acknowledged my presence
and the need to stop and remained stationary until the roadway was clear."

There were at least three units stopped in a line in each lane, for a total of six or seven vehicles.

At that location, where his grill was protruding, the roadway widens. He put the car in park. From the time he started to prohibit movement of traffic until the accident, three minutes elapsed. He sat in the final position with the car in park approximately 30 to 45 seconds. Once he placed his unit in park, he motioned for the disabled vehicle to move across. Just as the rear quarter of the vehicle was leaving the roadway, Ashbrook's attention on it was broken by the sound of the impact and the sensation of something striking the squad car. The impact started on the right front bumper. Claimant's car came to rest against the light pole to the south of the second driveway, just slightly to his left.

Ashbrook stated that the policy is not to exit the vehicle in a hazardous situation. Four Polaroid photographs (Respondent's group exhibit no. 3(A)-(D) and four other photographs (Respondent's exhibit nos. 5 through 8) were identified by the witness as accurately depicting the intersection. All were admitted without objection.

On cross-examination, Ashbrook stated that he could not identify the specific sections in which the policies, of which he had testified, were contained. There are no policies or guidelines that specifically set forth how an officer is to proceed when coming across a disabled vehicle. The Amoco station had a contract with the State as a repair vendor. He knew the owner, Tom Beasley.

He did not recall whether Trooper Lim testified at the traffic Court proceeding. He had no recall whether any other trooper testified at the traffic Court proceeding.

He came across the disabled vehicle 100 yards north of the Peterson overpass. The emergency patrol unit actually came to the scene *before* Ashbrook arrived. The emergency patrol unit did not exit the expressway with the disabled vehicle and Ashbrook, but instead continued south. He acknowledged that, at his deposition, he said that approximately three minutes elapsed from the time he came to a complete stop to the time he was struck. He conceded that it was possible that a vehicle could fit in the "extended area of the curb lane" (right-turn lane) if Ashbrook was stopped in a fashion to block the left turn, center and curb lanes of southbound Cicero. He had witnessed cars using the right turn lane to make a right turn on Peterson.

He did not know how far the sirens could be heard. His siren was not on the entire time he was stopping traffic because it would be interrupted by his use of the public announcement system.

Claimant argues that Trooper Ashbrook failed to exercise reasonable care which a reasonably prudent person would have exercised under the circumstances in the operation of his motor vehicle. (*Long v. Illinois Power Co.* (4th Dist. 1989), 187 Ill. App. 3d 614, 543 N.E.2d 525.) As a direct and proximate result of Respondent's negligence, Claimant was injured and sustained serious and permanent injuries.

Claimant asserts that Ashbrook violated Illinois traffic laws when he turned left across traffic and struck Claimant's vehicle. He violated sections 11—601 and 11—902 of the Illinois Vehicle Code (hereinafter the "Code") for failing to decrease his speed and yield the right-of-way to Claimant's vehicle. (625 ILCS 5/11—601, 902.) These violations are *prima facie* evidence of negligence. The points of impact on the two vehicles show that Respondent's vehicle struck Claimant's vehicle.

The trooper's assistance to the disabled vehicle is not an emergency situation within the meaning of the emergency exception. Section 11—205 of the Vehicle Code (625 ILCS 5/11—205) permits the driver of an emergency vehicle to disregard regulations governing directions of movement or turning when responding to an emergency call or when in the pursuit of an actual or suspected violation of the law or when responding to a fire alarm.

Assuming *arguendo* that the emergency exception applies, the trooper must still exercise due regard for the safety of all persons. (*Mayfield v. City of Springfield* (4th Dist. 1982), 103 Ill. App. 3d 1114, 432 N.E.2d 617.) Claimant cites *Bauman v. State* (1981), 34 Ill. Ct. Cl. 140) for the proposition that Trooper Ashbrook would be in violation of his duty to act with due regard if he was not using his lights and siren at the time of the accident. Section 12—601(b) of the Vehicle Code requires the use of sirens by vehicles on an emergency call to warn drivers of the approach thereof. (625 ILCS 5/12—601.) Claimant testified that she did not see lights or hear a siren. Ashbrook's testimony is not believable. Regardless of whether he used his lights or sirens, the manner in which Ashbrook violated the traffic laws was unreasonable.

Claimant asserts that the Court should admit into evidence the transcript of the traffic Court proceeding. If admitted, it would show that Ashbrook's partner testified to facts differently than Ashbrook.

The medical bills totaled $10,839.33. Claimant missed 35 days from work with a wage loss of $2,975 and had to pay someone $180 to perform her cleaning job. As a result of the accident, Claimant will spend another 21 years in pain and receiving treatment or medication. She should receive $175,000 for past pain and suffering and

loss of normal life and $300,000 for future pain and suffering and loss of normal life. Claimant seeks a total of $448,994.33.

Respondent acknowledges that troopers are held to the general standard of due regard for the safety of others, even though they may be given some exceptions to the general traffic laws. However, Respondent contends that Trooper Ashbrook did not breach any duty owed to Claimant. Respondent cites various statutes and other material to support its argument that Trooper Ashbrook had a "duty" to help remove the disabled vehicle. Respondent asserts that Ashbrook's conduct demonstrates that he exercised ordinary care with due regard for the safety of others.

Respondent contends that the transcript of the traffic Court proceeding should not be admitted because Claimant cannot verify that the testimony was given by the person alleged to be C. S. Lim. In the event the testimony is admitted, it supports the testimony of Ashbrook in some respects, including his claim that lights and sirens were activated at the time of the accident, and that the "contradictions" claimed by Claimant do not exist.

In the alternative, Respondent argues that Claimant was more than 50% contributorily negligent. (735 ILCS 5/2—1116(c).) Claimant violated her duty to keep a proper lookout for other vehicles and to drive within her lane. (625 ILCS 5/11—709(a).) She must use every reasonable precaution to avoid a collision with an automobile. *Katzenberger v. State* (1991), 43 Ill. Ct. Cl. 218 (1991).

Respondent reasserts that its diagram (Respondent's exhibit no. 2) should be admitted because a proper foundation was laid.

Respondent argues that the requested damages are exaggerated and should be limited to those pled in the

complaint and bill of particulars. She did not attempt to mitigate her damages by going through surgery or therapy. Her damages were not all related to the accident in question. In the alternative, should Claimant be awarded damages, the award should be reduced by the percentage of fault attributed to her. *Marquis v. State* (1985), 37 Ill. Ct. Cl. 221; 735 ILCS 5/2—1116(c).

For the Claimant to recover against the State, she must prove by a preponderance of the evidence that negligent acts or omissions of the State's employee were the proximate cause of the Claimant's injuries. *Bellamy v. State* (1990), 43 Ill. Ct. Cl. 337; *McCoy v. State* (1985), 37 Ill. Ct. Cl. 182. There are certain facts that are not disputed. The State trooper involved in the accident was assisting a disabled vehicle. He blocked, or attempted to block, *multiple* lanes of southbound traffic on Cicero Avenue. Claimant was utilizing an extended area of the southbound lanes commonly used as a right turn lane. Claimant's and the trooper's vehicles came into contact, and as a result of the impact and the subsequent impact with a pole, Claimant suffered personal injuries.

It is the circumstances surrounding the disputed facts that portend the outcome of this case. Claimant testified that she was traveling at 10 miles per hour in the right-hand turn lane when the trooper struck her car without warning. She testified that she did not hear a siren, or other noises, and did not see the semi-marked patrol car, or any emergency lights. It would be arguable that two moving vehicles could collide without either driver hearing or seeing the other. The Court could then apportion cause based upon the duty each driver owed to the other, as determined within the framework of the evidence.

The determination in this case is complicated by Trooper Ashbrook's testimony that his vehicle not only

had its siren and emergency lights operating, but that his vehicle was not moving at the time of impact. He testified that he placed his vehicle in "park" prior to the accident. No occurrence witnesses testified, although there apparently were numerous persons who might have witnessed the occurrence or nonoccurrence of certain key facts. Trooper Lim was unavailable, having predeceased the hearing. The purported traffic Court testimony was ruled inadmissible because it expressly referenced a witness by a different name (Nimson). A Mr. Beasley purportedly witnessed the incident; however, his affidavit was ruled not admissible pursuant to section 790.140 of the Court of Claims Regulations. The occupants of the disabled vehicle, or of the southbound vehicles, may have disputed or corroborated certain facts; however, no one was presented. Although photographs of Claimant's vehicle were provided, no one presented photographs of the trooper's vehicle. No accident opinion witnesses were presented. The absence of evidence turns this case into a classic dispute characterized by a type of "yes I did," "no you didn't," point and counter-point.

Due to the absence of objective nonbiased information available to assist in the factual determinations, the credibility of the witnesses is a key element. Both witnesses appeared to be credible witnesses. Neither party impeached the credibility of the other party's essential witness. In two minor points, it is believed each witness's credibility was scratched but not destroyed. Claimant testified on direct examination that she never had problems with her arms; however, on cross-examination she acknowledged having surgery the prior year for carpal tunnel syndrome affecting one arm. The trooper testified to at least two additional facts in his cross-examination that were not provided in his direct testimony. In his direct examination he said the emergency response vehicle traveled

in front of the disabled vehicle; however, he did not testify that the ERV did not exit the expressway until he was questioned on cross. On cross, he also acknowledged that he used his public address system at times, and the siren did not work when the PA system was used.

The Court finds that Claimant has proven a *prima facie* case of negligence sufficient to overcome a motion for directed verdict; however, she has not proven negligence by a preponderance of the evidence. She has not refuted, by a preponderance of the evidence, Respondent's evidence that the trooper's vehicle was stationary and that it had its sirens and emergency lights operational. A review of Respondent's exhibit no. 1 indicates that both of these essential facts were asserted on the day of the accident and no evidence was presented at the hearing, other than Claimant's testimony that the trooper's vehicle "struck" Claimant's vehicle. Because of this we determine that *Bauman v. State* (1981), 34 Ill. Ct. Cl. 140 is distinguishable.

The applicable portions of the statute cited permits a trooper to disregard traffic laws when responding to an "emergency call." (625 ILCS 5/11—205.) Although Trooper Ashbrook could not cite specific guidelines to cover his conduct in assisting the disabled vehicle, nothing has been provided to indicate that the situation does not fall under the meaning of responding to an emergency call. In fact, he testified that he thought the conditions were such that it was necessary to escort the vehicle to a safe place. No evidence was provided to dispute the conditions which the trooper testified led to his conclusion.

The Court finds that Claimant has not proven by a preponderance of the evidence that the trooper's vehicle was moving and that the sirens and lights were not operating. Her failure to do so supports a consistent finding

that the trooper acted with due regard for the safety of others within the meaning of the statute and the claim is denied.